898 N.E.2d 307 (2008)
In re the Involuntary Termination of the Parent-Child Relationship of M.S., a child, and H.S., his mother.
No. 09A04-0805-JV-276.
Court of Appeals of Indiana.
December 11, 2008.
*308 Bradley A. Rozzi, Cass County Public Defender, Logansport, IN, Attorney for Appellant.
Michael E. Boonstra, Logansport, IN, Attorney for Appellee.

OPINION
BAKER, Chief Judge.
Here, we are confronted with a mother who loves her children but is struggling to manage her oldest son's special needs. Specifically, her son suffers from a personality disorder that causes him to act aggressively toward others, so his mother asked for help from the Department of Child Services. Everyone agrees that, for now, the boy should continue to reside in a facility so that he can receive full-time medical and behavioral care. To terminate the mother's parental rights at this time is premature and would penalize her for asking for help. Therefore, we find that the trial court's order terminating the parent-child relationship was erroneous.
Appellant-respondent H.S. (Mother) appeals the trial court's order terminating her parental relationship with M.S., her eight-year-old son. Mother raises two arguments, one of which is dispositive; namely, that the evidence does not support the trial court's conclusion that termination is in M.S.'s best interests. Finding that the evidence is insufficient to establish that termination is in M.S.'s best interests at this time, we reverse and remand for further proceedings.

FACTS
M.S. was born to Mother and Father[1] on July 21, 2000. It has since been *309 learned that M.S. has severe behavioral difficulties, including Pervasive Personality Disorder, which is "autistic-like but it is not as severe. And autism is lack of social skills, behavioral difficulty." Tr. p. 45. People who suffer from this disorder require a very structured environment and a substantial commitment to childcare and supervision by a caregiver. The disorder is controlled with behavior management and medication. Id.
The Department of Child Services (DCS) first became involved with M.S. and mother in August 2002, when Mother asked for help, informing the Pulaski County DCS that she was unable to control two-year-old M.S.'s behavior or protect her other child[2] from him. M.S. was made a ward of the court in a Child in Need of Services (CHINS) action and placed in foster care from August 8, 2002, until December 20, 2002, at which time he was returned to Mother's care. This CHINS action was terminated on November 23, 2003.
On November 12, 2004, Mother brought M.S. to the Cass County DCS and informed personnel that she was unable to supervise M.S. and her two[3] other children, explaining that she could not "keep the rest of the household safe" if M.S. lived there. Appellant's App. p. 72. At the termination hearing, Mother explained that she bore the brunt of M.S.'s behavior problems:
Q. You've received some of the punishment he gives.
A. I've received the most of [M.S.'s] physical aggression.
Q. And that's when you're trying to hold him just to keep him from hurting himself or anybody else.
A. Yeah. Yes.
Tr. p. 75. On November 17, 2004, M.S. was placed in foster care. Mother admitted that M.S. was a CHINS on December 1, 2004.
M.S. remained in foster care until December 22, 2006, when DCS and Mother decided to attempt a trial home visit. M.S. lived at home with Mother until May 2007, when Mother again brought M.S. to DCS and said that she could not control his behavior. M.S. was placed in the Indiana Developmental Training Center on May 16, 2007, where he resided at the time of the termination hearing.
DCS offered, and Mother participated in, a number of services designed to help her acquire the skills to parent M.S., including home-based services, parenting classes, parenting assessments, IOP treatment, supervised parenting time with M.S. during the lengthy periods of removal from the home, weekend visits, overnight visits, trial home visits, and other services. Notwithstanding these services, however, Mother and M.S. continued to need help.
On June 19, 2007, DCS filed a petition to terminate the parental relationship between M.S. and Mother. The trial court held a hearing on the petition on August 8, 2007, and on January 30, 2008, the trial court entered an order terminating Mother's parental rights to M.S.:
5. It was established by clear and convincing evidence that the allegations of the petition are true in that:

*310 * * *
b. There is a reasonable probability that:
(1) The conditions that resulted in the child's removal or the reasons for the placement outside the parent's... home will not be remedied because [M.S.] was originally made a ward of [DCS] in Pulaski County in 2002 because the mother could not control his behavior. He was removed a second time and became a ward of the Cass County [DCS] in November of 2004. A period of reunification occurred between December 2006 and May 2007. However, on May 24, 2007, the child was removed from the parent's home because the mother reported to [DCS], city police and Logansport school that he was a danger to himself, his siblings and to his mother.
(2) Continuation of the parent-child relationship poses a threat to the well-being of the child because all efforts to provide structure and support for the mother have been ineffective. Prior to the May 2007 removal the mother had been provided with every service available over a period of three years. She has had psychological testing and counseling. She attended parenting classes in both Pulaski and Cass County. Preventative Aftercare and Building Blocks in Education provided intensive home-based services. The mother has received public assistance, medical coverage, and has participated in the WIC program. Additionally, she has been provided with transportation and parenting time and has received individual counseling and therapy. These services were not effective and resulted in the child's removal from the mother for a third time. The removals are disruptive to the child and counter to his best interests.
c. Termination is in the best interest of the child in that prior to the date of hearing the Cass County [DCS] was involved in providing services, as described above, for a period of three years. The child's mother has failed to use the services offered for the well-being of the child. Periods of removal have served a respite for the mother and during times of removal her parenting contacts with the child are sporadic and perfunctory. The ambivalence of the mother causes confusion and disruption to the child. The child has not had the benefit of a nurturing, safe and stable home when he has lived with his mother. His emotional and mental conditions are exacerbated by the unreliable parenting demonstrated by the mother.
Appellant's App. p. 6-7. Mother now appeals.

DISCUSSION AND DECISION
Mother argues that the evidence is insufficient to support the trial court's decision to terminate her parental relationship with M.S. We will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind.Ct.App.1997). We neither reweigh the evidence nor judge the credibility of witnesses, and we will consider only the evidence that supports the trial court's decision and the reasonable inferences that may be drawn therefrom. Id. If the evidence and the inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App. 1999).
*311 We acknowledge that the involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children. Id. Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed. Id. The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Id. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities. Id.
To effect the involuntary termination of a parent-child relationship, the State must present clear and convincing evidence establishing the following elements:
(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC XX-XX-XX-X.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
Ind.Code § 31-35-2-4(b)(2).
In construing this statute, this court has held that when determining whether certain conditions that led to the removal of the children will be remedied, the trial court must judge the parent's fitness to care for the children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re D.J., 755 N.E.2d 679, 684 (Ind.Ct. App.2001). A parent's habitual pattern of conduct must also be evaluated to determine the probability of future negative behavior. Id. The trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development are permanently impaired before terminating the parent-child relationship. Id.
Additionally, the trial court may consider the services offered as well as the parent's response to those services. Id. Parental rights may be terminated when parties are unable or unwilling to meet their responsibilities. Ferbert v. Marion County OFC, 743 N.E.2d 766, 776 (Ind.Ct.App.2001). Also, when determining what is in the best interests of the children, the interests of the parents are subordinate to those of the child. Id. at 773. Thus, parental rights will be terminated when it is no longer in the child's best interests to maintain the relationship. In re B.D.J., 728 N.E.2d 195, 200 (Ind.Ct. App.2000).
Here, everyone who testified agreed that Mother loves her children and did *312 everything that was asked of her. DCS's attorney explained that the circumstances
occurred without the fault of anyone particularly. This hearing is not about [Mother] being a bad mother or a good mother, either one. It's not about that. We're notthe focus of our difficulty is not on [Mother's] parenting ability at all. It's not to say that she's a bad parent.
Tr. p. 21. One of the caseworkers overseeing M.S.'s case agreed that the underlying problem is M.S.'s behavior rather than Mother's parenting skills:
Q. Basically what you've observed or what your investigations have told you are that the problems are [M.S.'s] behavior more than anything.
A. More than anything, yes.
Q. That, for example, I know one report talks about how [Mother] intervened the only way she could which was to protect the younger child, held him all night and suffered injuries herself.
A. Yes, she did.
Q. So she's been doing what she can.
A. She's been taught all the skills that she needs to deal with him.
Q. And as far as you can tell she's doing what she can.
A. Yes.
Id. at 36-37; see also id. at 27 (former caseworker testified that the reason for DCS's intervention was "the child's behavior" rather than "the mother's behavior"), 52 (M.S.'s former foster mother testified that she has "[n]o doubt" that Mother loves M.S.). Mother completed all services and made every effort. The heart of this family's struggle is not Mother's parenting skills; rather, it is M.S.'s special needs. Id. at 22 (DCS attorney explained that the termination proceeding was "about [M.S.'s] special needs").
M.S. exhibits a number of problematic and aggressive behaviors at home and away from home, including kicking, biting, hitting, spitting, throwing things, and injuring his younger brothers and Mother. Id. at 29. Amy Smith, a social worker at the Indiana Developmental Training Center (the Center), where M.S. has lived since May 2007, explained his difficulties as follows:
[M.S.] has had continued behaviors at our facility, mostly with being aggressive towards staff and peers, non-compliance with staff directions which has increased since ... the June report. He doesn't like to be told no, he doesn't like to follow directions, and when he's asked to do something he does not like to do, he tends to become aggressive with staff.
Id. at 42-43; see also id. at 52-53 (former foster mother explained that M.S. frequently screamed, kicked, hit, and threw things and that it was difficult to maintain his routine and protect their other children). Smith also testified that "[M.S.] requires a lot of structure. A lot of times he requires one-on-one staff attention when he's especially getting agitated." Id. at 43.
DCS concluded, and the trial court agreed, that terminating the parental relationship between Mother and M.S. was in the child's best interests. Specifically, DCS argues that M.S. would be best served "in the long run by perhaps an adoption by a, to be an only child, for example, by a very specialized set of circumstances." Id. at 22. Amanda Shelton, a case manager, testified that
It's evident that [Mother] and [M.S.] do love each other very much. However, sometimes love cannot be enough. [M.S.], in order to keep himself safe and others safe, needs constant supervision *313 at this time and we feel like in the future [Mother] will not be able to provide him.
Id. at 65. Shelton explained that she believed termination was necessary because
from my experience with [Mother] she has been incapable of providing those services to [M.S.] and continuing that extra support to [M.S.]. This is going to be an ongoing issue, and she's already had support in her home through service providers and it feels like that's, it's not going to be a solution.
Id.
DCS's own witnesses, however, testified that M.S. will need to remain a resident of the Center until he is stabilized. The average length of stay at the Center is eighteen to twenty-four months. Id. at 47. The status of M.S.'s relationship with Mother affects neither his ability to remain in the Center nor the fact that he continues to need specialized behavioral and medical assistance. Id. at 35-36 (case manager testified that the Center is providing the specialized care and medical assistance that M.S. needs), 47 (Center social worker testified that the parental relationship need not be terminated for M.S. to receive services at the facility). Indeed, a case manager testified that DCS will be paying for M.S. to stay at the Center regardless of whether the parental relationship is terminated. Id. at 67. At the time of the termination hearing, M.S. was taking numerous prescription medications and his psychiatrist and personnel at the Center were still experimenting with dosage levels and trying to determine whether they could wean him off of some of the drugs altogether. M.S. was not stabilized at that time.
Notwithstanding the fact that M.S. was not stabilized at the time of the termination hearing, DCS argued that termination was appropriate because M.S. may never be able to live in a home with other children. DCS's own witnesses, however, acknowledged that there is no way for anyone to know what M.S. and Mother will be able to handle once he is stabilized. Specifically, the social worker from the Center testified that "I think at the level [M.S. is] at right now in his treatment I don't think at this time he would be, it would be a good idea to put him back in the household with other children. However, with further treatment I don't know if that would be the case." Id. at 45. Additionally, M.S.'s case worker testified that M.S.'s future prognosis is unknown:
A. [W]e specifically placed him [in the Center] with the understanding that an emphasis should be placed on stabilization and then we would immediately move to foster care placement.
Q. [Miss Shields] also indicated that upon stabilization that he may be appropriate around other children, he may not.
A. That's very true.
Q. So at this point we don't know what [M.S.'s] circumstances are going to be until he's stabilized.
A. Yes.
Id. at 70. M.S.'s caseworker testified that DCS's plans for M.S. are similarly unknown, in large part because no one knows when M.S. will be released from the Center:
First and foremost, he's only at the [Center] until he becomes stabilized. And I have made inquiry into appropriate foster homes that specifically, the parents specifically specialize in caring for autistic children.... Some of those homes would potentially consider adoption, but it's not an appropriate time to be specifically talking about adoption *314 [because Mother's parental rights had not yet been terminated].
Id. at 68.
Mother testified that when M.S. is stabilized, he "gets along with his brothers":
He's awesome. Most people can't even tell there's anything wrong with [M.S.] when we can get his medication situated and get him on a functional basis. He's, he can go through school, he can go through daily routines, and when he's not having trouble with the aggression he's been a giant helper with the two younger kids. He loves helping.
Id. at 74. Mother acknowledges that, for the time being, M.S. needs to be cared for by the Center. She hopes, however, that after he is stabilized, he could return home, explaining that termination does not make sense as a solution: "Well, it's just, it kind of confuses me if he's stabile [sic] enough to release why couldn't he come home if stable is what they say he is." Tr. p. 75.
Viewing the evidence most favorably to the judgment, it is evident that this family is struggling. M.S. and Mother need help, which Mother recognized years ago. She explained that she voluntarily contacted DCS because she knew that M.S. needed specialized care that she could not provide and she "was informed that to get him the proper care I financially wasn't going to be able to do it and as a CHINS that it could be provided." Id. at 76-77. Having M.S. declared a CHINS was her "last resort" needed to keep all of her children safe. Id. at 78.
Having closely reviewed the record herein, we are compelled to conclude that termination of Mother's parental rights at this time is, at best, premature. No one can predict whenor even whetherM.S. will become stabilized. And no one can predict what will be best for him when and if he becomes stabilized. But to say that Mother's parental rights must be terminated merely because her child has special needs and she needs help to manage his behavior would send a sobering message indeed to all of the parents in Indiana with children who need ongoing medical or psychological assistance. In effect, as aptly put by Mother's attorney during the termination hearing, taking this step "creates a message that if you've got a child that is difficult and you do seek help for that child, your reward is the child is removed, never to return." Tr. p. 93.
The problem here is not Mother's parenting skills or her love for her children, nor has she been reluctant to comply with DCS's suggested services. Instead, the problem is M.S.'s special needs. Rather than taking the radical action of severing the parent-child bond prematurely, DCS and the courts should be focused on helping M.S. to become stabilized and reevaluating his best interests when and if stabilization occurs. At this time, however, we find that the trial court erred by concluding that termination of the parent-child relationship is in M.S.'s best interests.[4]
The judgment of the trial court is reversed and remanded for further proceedings.
NAJAM, J., and KIRSCH, J., concur.
NOTES
[1] Father's parental rights to M.S. were terminated on August 24, 2007, and he did not appeal that judgment.
[2] At some point after M.S.'s birth in July 2000 and before DCS's first involvement with the family in August 2002, Mother had given birth to a second child.
[3] At some point between August 2002 and November 2004, Mother gave birth to a third child.
[4] Inasmuch as we find that the evidence is insufficient to support termination, we need not address Mother's argument that she received the ineffective assistance of counsel at the termination hearing. We note, however, that in our view, her attorney did a superb job.