In re the Matter of N.E.

N.L., Appellant–Respondent,

v.

Marion County Department of Child Services, Appellee–Petitioner,

and

Child Advocates, Inc., Appellee–Guardian–ad–Litem.

No. 49A02–0806–JV–522.

Court of Appeals of Indiana.

March 19, 2009.

Transfer Granted June 11, 2009.

Steven J. Halbert, Carmel, IN, Attorney for Appellant.

Robert J. Henke, Indiana Department of Child Services, Indianapolis, IN, Deborah S. Burke, Staff Attorney, Grant County Office, Indiana Department of Child Services, Marion, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Respondent, N.E.'s father (Father), appeals the trial court's determination that N.E. is a child in need of services (CHINS).

We reverse and remand with instructions.

### ISSUES

Father raises three issues, which we restate as follows:

(1) Whether the fact finding hearing was timely held;

(2) Whether the trial court erred by failing to state its reasons for its disposition; and

(3) Whether the trial court's disposition is supported by the evidence.

### FACTS AND PROCEDURAL HISTORY

N.E., born January 24, 2004, is one of Mother's four children, each with a separate father. On December 12, 2007, the Marion County Department of Child Services (DCS) filed a petition alleging that all of Mother's children were CHINS due to Mother's inability or refusal to protect them from ongoing instances of domestic violence between herself and the alleged father of her youngest child. The petition also stated that "it is believed that none of the alleged fathers has established paternity for their respective children, and none of them have come forward to demonstrate the ability or willingness to appropriately parent their children." (Appellant's App. p. 66). Accordingly, DCS removed Mother's children. At the time DCS performed the removal, N.E. was at Father's house. Father was unaware that his paternity of N.E. had been established at this time, but he was confident he was N.E.'s biological father.

On January 15, 2008, the juvenile court held a hearing at which the juvenile court appointed a Guardian Ad Litem and entered a denial on behalf of Father. Further, the juvenile court ordered Mother

and Father to undergo DNA testing to determine the paternity of N.E. Finally, the juvenile court ordered, over DCS's objection, that N.E. be placed in the custody of Father, and her paternal grandmother (Grandmother) effective immediately.

On January 23, 2008, the DCS filed a motion for removal of N.E. from the care of Father and Grandmother. The DCS provided an affidavit from a caseworker stating that Father had a prior conviction for domestic battery. Further, the affidavit stated that N.E.'s paternal grandfather (Grandfather) lived at the house with N.E., Father, and Grandmother. Mother told the caseworker that Grandfather has an addiction to crack cocaine, and the caseworker learned that Grandfather had been convicted of battery against his wife. Additionally, at the time of the affidavit, Grandfather had an outstanding warrant for his arrest due to a probation violation. On February 1, 2008, the juvenile court granted the motion for removal of N.E. and had her placed in foster care with her siblings.

On February 12, 2008, the juvenile court held another hearing. Mother entered an admission to the CHINS petition and the juvenile court continued the hearing for a fact finding hearing with respect to Father per Father's request. Father agreed to waive a requirement that the hearing be completed within sixty days. The juvenile court ordered the children to be wards of DCS, but ordered the DCS to immediately complete a Youth Emergency Services (YES) assessment and homestudy of the home of Father and Grandmother.

Another hearing was held on March 18, 2008. The DCS had not yet completed the YES assessment. The DCS noted that they had not yet received fingerprint checks for Father, and Father explained that he had submitted his fingerprints just the day before. DCS requested a continu-

ance of the hearing, and Father did not object.

On April 21, 2008, the juvenile court held the final hearing in this matter. Father moved to dismiss the CHINS proceedings against him, arguing that the factual hearing had not been completed within sixty days after the filing of the petition as required by Indiana Code section 31–34–11–1. The juvenile court denied that motion and proceeded with the factual hearing.

Kristina Lawrence (Lawrence) of the DCS testified at the hearing that Mother told her that Grandfather was living in the house with Grandmother and Father. This concerned Lawrence because Father had not divulged that fact, and DCS needs to be informed about all persons living in a house where a child is placed. Father later told Lawrence that Grandfather did not live there but "made it sound like he's in and out." (Transcript p. 56).

Father's position during the hearing was that he and Grandmother had been the primary caregivers for N.E. over the majority of her life, not Mother. He therefore contended that N.E. was not a CHINS due to Mother's acts or omissions because N.E.'s home was with Father and Grandmother. To support this contention, Father testified that he and Grandmother had kept N.E. for approximately three years and eight months out of the first four years of N.E.'s life. Grandmother testified that she and Father had taken care of N.E. ninety-five percent of the time. However, Mother testified that the majority of the time that Grandmother had watched N.E. was at Grandmother's day care, for which Grandmother received child care development funds through a federal program, and was at the same time that she watched other children including N.E.'s three siblings. Other witnesses testified, and their testimony generally de-

tailed that N.E. split time between staying with her Mother and Father/Grandmother, but spent more time with her Father and Grandmother. Additionally, N.E. and her siblings would sometimes spend weekends with Mother's foster mother. Father admitted that he had never pursued establishing paternity over N.E., but informed the juvenile court that he had just learned the week prior to the hearing that Mother had "filed something" in April of 2007, which resulted in an order that he owed child support.[1]

After the hearing, the juvenile court found that "it is contrary to the health and welfare of the children to be returned home and that reasonable efforts have been made to finalize a permanency plan for the children." (Appellant's App. p. 147). Accordingly, the juvenile court ordered the children to be wards of the DCS with placement in continued foster care. However, the juvenile court refused to make its determination a final appealable order at that time.

On May 30, 2008, the juvenile court held a disposition hearing and a default hearing. After that hearing, the juvenile court made an entry, which the parties have treated as the final appealable order, wherein the juvenile court repeated its previous statement that "it is contrary to the health and welfare of the children to be returned home and that reasonable efforts have been made to finalize a permanency plan for the children." (Appellant's App. p. 63). The juvenile court also restated that the children are to be wards of the DCS.

Father now appeals. Additional facts will be provided as necessary.

---

1. A Judgment of Paternity and Support was filed as the only exhibit at the hearing. It is dated March 31, 2008, but states that it is "effective" as of "4/11/2008." (Respondent's

## DISCUSSION AND DECISION

### I. Timeliness of Fact Finding Hearing

Father contends that the juvenile court erred when it held the final fact finding hearing more than sixty days after the filing of the CHINS petition as required by Indiana Code section 31-34-11-1. However, the record is that Father waived his right to have the hearing held within sixty days at the hearing that occurred on February 12, 2008. (See Appellant's App. p. 27). Therefore, we conclude that this issue is waived for appellate review.

### II. Failure to State Reasons and Lack of Evidence

Father also contends that the juvenile court erred by not stating the reasons for its disposition when concluding that N.E. was a CHINS and that the evidence does not support a finding that N.E. was a CHINS with respect to Father. Because we find these issues to be intertwined, we will address them together.

In CHINS proceedings, the trial court is required to:

(a) ... accompany the court's dispositional decree with written findings and conclusions upon the record concerning the following:

(1) The needs of the child for care, treatment, rehabilitation, or placement.

(2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.

(3) Efforts made, if the child is a child in need of services, to:

(A) prevent the child's removal from; or

(B) reunite the child with;

Ex. A p. 4). The judgment also states that Father owes past-due support in the amount of $2,244, which means that the effective date had to have been April 11, 2007, not 2008.

the child's parent, guardian, or custodian in accordance with federal law.

(4) Family services that were offered and provided to:

(A) a child in need of services; or

(B) the child's parent, guardian, or custodian;

in accordance with federal law.

(5) The court's reasons for the disposition.

(b) The juvenile court may incorporate a finding or conclusion from a predispositional report as a written finding or conclusion upon the record in the court's dispositional decree.

I.C. § 31–34–19–10.

Here the juvenile court stated:

The Court finds that reasonable efforts have been offered and available to prevent or eliminate the need for removal from the home. After reviewing the reports and information from the Office of Family and Children, service providers and other sources, which the Court now incorporates into this order (see Court file), the Court also finds that the services offered and available have either not been effective or been completed that would allow the return home of the children without Court intervention.

The Court finds that it is contrary to the health and welfare of the children to be returned home and that reasonable efforts have been made to finalize a permanency plan for the children[.]

(Appellant's App. p. 63). These same findings were stated by the trial court in its entries made before and after the fact finding hearing of April 21, 2008. (Appellant's App. pp. 63, 113, 127, and 147). We have previously addressed these exact same findings from the same trial court by our opinion in *In re J.Q.*, 836 N.E.2d 961 (Ind.Ct.App.2005), *reh'g denied*, by stating:

The limited findings of the trial court, on record at least, make it difficult for this court to determine whether or not a mistake has been made in adjudicating J.Q. as a CHINS. Our review of the record in its entirety yields evidence that could support either outcome, but we are in no position to reweigh such evidence. However, we are also not in the position to read the trial court's mind in regard to its findings of fact. Indiana Code § 31–34–19–10(5) requires that the trial court give reasons for its disposition in a CHINS proceeding. Specifically, we are concerned that procedural irregularities, like an absence of clear findings of fact, in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights.

*Id.* at 966–67 (citations omitted). Accordingly, we reversed and remanded the CHINS determination "with instructions that the trial court more specifically follow the requirements of [ ] I.C. § 31–34–19–10." *Id.* at 967.

Here, however, in addition to these limited findings, the juvenile court also expressly adopted the "Pre–Dispositional Report of the Division of Family and Children and incorporates [the] same as the findings of the Court." (Appellant's App. p. 63). The Pre–Dispositional report stated:

[DCS] determined that these children [are] children in need of services because their mother and sole legal custodian [ ] has failed to protect her children from ongoing domestic violence between herself and the alleged father of [D.P.] There have been several incidents of violence cases pending against [D.P.'s father] as a result. [Mother] has continuously failed to cooperate in the prosecution of those domestic violence cases

and has exhibited a lack of cooperation with DCS to ensure the safety of her children. Based upon [Mother's] failure to protect her children and her lack of cooperation, the children are in serious danger in the care of their mother.

(Appellant's App. p. 122). That being said, the DCS made no allegation that Father knew of the acts or omissions by Mother which resulted in the CHINS proceeding.[2] Even considering the Pre–Dispositional Report as a part of the trial court's findings, there are no findings directed at Father. The DCS did bring concerns about the suitability of Father's home for a placement of N.E. while the CHINS proceedings were taking place; however, none of the juvenile court's findings addressed these concerns previously brought to light by the DCS. As such we agree with Father, in that the juvenile court has failed to make sufficient findings. Still, other errors preclude us from simply remanding for findings without further discussion.

The American family is an evolving institution, and at times, this recognition has forced the law to evolve along with it. Not so long ago, the United States Supreme Court was confronted with a petition for writ of certiorari from Illinois, a state which was a source of inspiration for our own juvenile court system. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Frank Sullivan, Jr., *Indiana Juvenile Courts*, 30 Ind. L.Rev. 279, 286 (1997). In *Stanley*, a mother of multiple children died, and her children were taken from the care of their father, who had been the unmarried companion to the deceased mother. Illinois contended that "unwed fathers are presumed to be unfit to raise their children and that it is unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents before they are separated from their children." *Stanley*, 405 U.S. at 647, 92 S.Ct. at 1210. The Court held that since married fathers or mothers could not have their children taken without "notice, hearing, and proof of . . . unfitness as a parent," it was a violation of equal protection and due process to take children from unwed fathers without such procedures. *Id.* at 650, 92 S.Ct. at 1212.

Here, because the juvenile court made no findings as to the extent of Father's

---

2. The relevant allegations in the petition alleging that Mother's children were CHINS stated:

> The children's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of a parent, guardian or custodian to supply one or more of the children with necessary food, clothing, shelter, medical care, education or supervision, and the children need care, treatment or rehabilitation that the children are not receiving and are unlikely to be provided or accepted without the coercive intervention of the Court, as shown by the following, to wit:
> A) On or about December 12, 2007, the Marion County Department of Child Services [ ] determined, by its family Casemanager [ ] Kristina Lawrence, these children to be children in need of services because their mother and sole legal custodian, [ ],

> has failed to protect her children from ongoing domestic violence between herself and the alleged father of [D.P.]. There have been several incidents of violence cases pending against [D.P.'s father] as a result. [Mother] has continuously failed to cooperate in the prosecution of those domestic violence cases and has exhibited a lack of cooperation with DCS to ensure the safety of her children. Based upon [Mother's] failure to protect her children and her lack of cooperation, the children are in serious danger in the care of their mother.
> B) . . . It is believed that none of the alleged fathers has established paternity for their respective children, and none of them have come forward to demonstrate the ability or willingness to appropriately parent their children.

(Appellant's App. p. 66).

care giving for N.E., we do not know exactly how similar this situation is to that in *Stanley*. The record is laced with evidence that Father was a primary caregiver, but the DCS put on evidence attempting to refute that fact, and it is not for us to weigh the evidence. *J.Q.*, 836 N.E.2d at 966. Furthermore, the juvenile court held a hearing and permitted Father to present evidence, but DCS made no allegations impugning Father's parenting directly and the juvenile court made no findings with respect to Father.

Normally, a juvenile court would determine that a child is either a CHINS or is not a CHINS when presented with a CHINS petition. However, before the juvenile court, Father articulated the argument that although N.E. was a CHINS with respect to Mother, she was not a CHINS with respect to him. This is an interesting perspective which we feel deserves further consideration.

Based on the allegations before the juvenile court, the requirements of either Indiana Code sections 31–34–1–1 or 2 could have been used to pursue a CHINS determination of N.E. and her siblings. However, both require a finding that there is "care, treatment, or rehabilitation that . . . is unlikely to be provided or accepted without the coercive intervention of the court." I.C. §§ 31–34–1–1, 2. At first blush, it seems that if a child was not a CHINS with respect to either of its parents, the coercive intervention of the court would not be necessary because that parent would be providing or accepting the necessary care, treatment, or rehabilitation on the child's behalf. However, we have recently addressed a CHINS disposition as it relates to each parent as separate issues. *See In re C.S.*, 863 N.E.2d 413, 418 (Ind.Ct.App.2007), *trans. denied* (holding that a child was not a CHINS with respect to its father where the child

had been found to be a CHINS with respect to mother but there was no allegation and no evidence that the father was responsible for the circumstance which led to the CHINS determination). We did so without discussion of how or why we could split our analysis, looking at each parent individually. We believe that certain principles and considerations may make such a split analysis appropriate in some instances.

■■■ Our juvenile law consists of countervailing priorities influenced by the various circumstances characterizing each case. The primary focus of our juvenile law is the best interests of the child, and the interests of the parents are subordinate to those of the child. *See In re M.S.*, 898 N.E.2d 307, 311 (Ind.Ct.App. 2008). Be that as it may, a major component of a CHINS proceeding is an accusation against or acknowledgment of a deficiency in the care from the child's parent, guardian, or custodian. *See* I.C. chapter 31–34–1. We also must note, "[o]ne of the purposes of the Indiana Juvenile Code is 'to provide a judicial procedure that insures fair hearings and recognizes and enforces the constitution and other legal rights of children *and their parents.*'" *J.Q.*, 836 N.E.2d at 965 (quoting *Roark v. Roark*, 551 N.E.2d 865, 868 (Ind.Ct.App. 1990)) (emphasis added). "Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *A.P. v. Porter County Office of Family and Children*, 734 N.E.2d 1107, 1112 (Ind. Ct.App.2000), *trans. denied*. We have acknowledged that these constitutional rights must be applied to prevent the undue intrusion of the government into the parent

child relationship. *In the Matter of E.M.*, 581 N.E.2d 948, 952 (Ind.Ct.App.1991), *trans. denied.*

■ Further, although a CHINS proceeding is distinct from a termination of parental rights proceeding, our legislature has enacted an interlocking statutory scheme linking those two processes. *A.P.*, 734 N.E.2d at 1112. Therefore, we have noted that procedural irregularities "in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights." *J.Q.*, 836 N.E.2d at 967 (citing *A.P.*, 734 N.E.2d at 1112–1113). However, by providing parents a right to representation of counsel in termination proceedings, but not in CHINS proceedings, our legislature has juxtaposed due process rights owed in those proceedings, giving more protection due in termination proceedings. *See* I.C. §§ 31–32–2–3 and 5. This is all consistent with the very nature of due process, which negates any concept of inflexible procedures universally applicable to every imaginable situation; what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. *Stanley*, 405 U.S. at 650–51, 92 S.Ct. at 1212.

*C.S.* involved a circumstance similar to that before us now: a father who lived apart from the mother alleged to have endangered the health or wellbeing of her child; the father had attempted to be involved in his child's life, but had yet to establish paternity by the time that the CHINS petition had been filed against the mother. 863 N.E.2d at 415. The circumstance before us now may necessitate a split analysis with respect to each parent so that the coercive intervention of the juvenile court can see that the parent who has been deficient in his or her care giving can receive the assistance they may need, and to facilitate the placement of the child in the custody of the other parent if such placement is prudent.

■ Moving on to our situation here, Indiana Code section 31–34–9–7 provides that "The (1) child; (2) child's parents, guardian, or custodian; (3) department; and (4) guardian ad litem or court appointed special advocate; are parties to the proceedings described in the juvenile law and have all rights of parties under the Indiana Rules of Trial Procedure." Thus, although Father did not know he had been established legally as the parent of N.E. at the early stages of the CHINS proceedings, once the trial court was presented with the court order which established paternity, Father was a party to the proceeding. As such, when the juvenile court determined that N.E. was a CHINS, the juvenile court impugned the parenting abilities of Father without specific allegations or specific findings of fact.

In all CHINS proceedings, the DCS must present specific allegations in a CHINS petition including a concise statement of the facts upon which the allegations are based and the date and location at which the alleged facts occurred. I.C. § 31–34–9–3. Further, the DCS bears the burden of proving that a child is a CHINS by a preponderance of the evidence. I.C. § 31–34–12–3; *E.M.*, 581 N.E.2d at 952.

■ Here, the DCS alleged by the petition, in pertinent part, that:

It is believed that none of the alleged fathers has established paternity for their respective children, and none of them have come forward to demonstrate the ability or willingness to appropriately parent their children.

(Appellant's App. p. 66). This is not an allegation that would conform to the requirement of Indiana Code section 31–34–9–3, but we understand that this is prudent consideration on the part of the DCS nonetheless. This is where due process needs to be flexible and responsive to the circumstances and interests at stake. *See Stanley*, 405 U.S. at 650–51, 92 S.Ct. at 1212. Where the DCS has alleged specific facts that would require removal of a child from the care of a custodial parent, it would be irresponsible of the juvenile court to release the child alleged to be a CHINS to a non-custodial parent without making a preliminary determination that the parent is willing and able to appropriately parent the child. However, this should be a flexible determination keeping in mind the constitutional protection against the State's undue intrusion into the parent child relationship. *E.M.*, 581 N.E.2d at 952. Father has appeared before the court seeking to demonstrate his ability and willingness to appropriately parent N.E. Without allegations from the DCS alleging that Father has been negligent, deficient, or worse in his duties as a parent, the trial court's findings with respect to Father should be directed solely at his willingness and ability to appropriately parent N.E. This the trial court has not yet done.

 Once a non-custodial parent demonstrates that he or she is willing and able to parent to the child alleged to be a CHINS, due process requires that the DCS present allegations directed at that parent, which, if proved, would meet the requirements for a CHINS determination under Indiana Code chapter 31–34–1 if the DCS thinks it is appropriate for the court to intervene in that parent child relationship. This would require an amendment

of the existing petition or the filing of a new petition.[3] Thereafter, the DCS must prove those allegations by a preponderance of the evidence and the trial court must make specific findings based on the record concluding that the child is a CHINS.

### CONCLUSION

Based on the foregoing, we conclude that the DCS has not alleged N.E. to be a CHINS with respect to Father. Therefore, we remand for the juvenile court to determine whether Father is willing and able to appropriately parent N.E. since N.E. is a CHINS with respect to mother.

Reversed and remanded with instructions.

DARDEN, J., concurs.

VAIDIK, J., dissents with separate opinion.

VAIDIK, Judge, dissenting.

I respectfully disagree with the majority's conclusion that N.E. is a CHINS as to Mother only. Rather, I believe that a child is either a CHINS or is not a CHINS and that the DCS has met its burden of proving that N.E. is a CHINS. However, because I believe that the juvenile court's dispositional order falls short of the statutory requirements and therefore we do not know the court's reason for its disposition, I would remand this case for a new dispositional order in accordance with Indiana Code § 31–34–19–10. Because the majority is remanding for a different purpose, I dissent.

As an initial matter, I believe that a child is either a CHINS or is not a CHINS because a CHINS determination regards

---

**3.** We note that because a child can be a CHINS due to a parent's failure to act, the allegations could assert that the parent knew of acts or omissions by the other parent, but did nothing about them. *See* I.C. §§ 31–34–1–1 and 2.

the status of the child.[4] For this reason, I believe that the act of one parent can be enough for a child to be adjudicated a CHINS. Indiana Code § 31–34–1–1 governs a CHINS determination and provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Here, Mother admitted that N.E. was a CHINS,[5] but Father denied it. Nevertheless, Father was entitled to a hearing to contest the CHINS allegations. The basis of Father's denial was that N.E. spent the vast majority of her time with Father and Grandmother and therefore she was not exposed to the domestic violence in Mother's home that formed the basis of the CHINS petition. The final hearing was held on April 21, 2008.

At this hearing, conflicting evidence was presented regarding where N.E. spent the majority of her time. Father testified that N.E. lived three years and eight months out of her first four years with him and Grandmother. Grandmother testified that she and Father took care of N.E. ninety-five percent of the time. Mother testified that N.E. lived with her the majority of the time and that most of the time Grandmother watched N.E., it was in her day care, for which Grandmother received government funds. Evidence was also presented that paternity had been recently established in Father, that Father had a domestic violence conviction in July 2007 involving his ex-girlfriend and was currently taking anger management classes, and that Father's father, who has an unsavory background, was in and out of Father and Grandmother's home. In addition, during the hearing, Father had an outbreak during which he said "bi* * *" and then walked out of the courtroom. Tr. p. 89–90. At the conclusion of the hearing, the DCS attorney argued:

I think the evidence shows that while [N.E.] may have spent a good portion of her time with [Father], he didn't have legal custody. [N.E.] was with her mother and therefore, was exposed to the endangerment caused by the domestic violence situation with [D.P.]. I don't think anybody can tell how often she

---

4. As the majority acknowledges, this Court in *In re C.S.*, 863 N.E.2d 413 (Ind.Ct.App.2007), *trans. denied*, addressed a CHINS disposition as it related to each parent as separate issues, but it did so without any discussion or analysis as to why it was appropriate to do so under the statute. I believe that the issue in that case, as in this case, is the appropriate disposition.

5. The DCS alleged that Mother had failed to protect N.E. and her other children from ongoing domestic violence between herself and the alleged father [D.P.] of her youngest child

and that there had been several incidents of [D.P.] beating Mother in the presence of her children. As a result, there were two domestic violence cases pending against [D.P.]. In addition, the DCS alleged that Mother had continuously failed to cooperate in the prosecution of these domestic violence cases and had exhibited a lack of cooperation with the DCS to ensure the safety of her children. The DCS believed that based upon Mother's failure to protect her children and lack of cooperation, "the children are in serious danger in the care of" Mother. Appellant's App. p. 66.

would've been exposed to that but she was exposed to it somewhat. And that's enough. The law says we don't have to wait until a child is bleeding before we remove them. There is endangerment in that situation. [Father], to this day, does not have legal custody. Has not taken steps. Does not seem to know how to and is not, neither he nor his mother had taken stops to get legal custody. The child therefore, fits the definition of a child in need of services, ev[e]n as to [Father]. The issues of placement, if perhaps he and his mother are appropriate for placement, but that's a separate issue.

*Id.* at 161–62. Father's attorney responded:

I think we started out today with everybody besides me saying the kid lived with mom and only with mom. And now, at least DCS is willing to say that [N.E.] spent a good portion of time with [Father] also. I've turned at least one opinion today, and hopefully I can convince another person. The, the good portion of time that the child spent with [Father], the child wasn't exposed to domestic violence. The, the one sort of mark against [Father] is he does have a domestic violence conviction, but he did his time and he's working on his [anger management] classes right now. And that incident didn't occur in the home. [Father] has been established as father of the child, even though it was sort of without his knowing, as the exhibit A shows.... But now we've heard every-

thing and we've got the one witness against [Father] which is [Mother], whose [sic] got all kind[s] of reason[s] to tell you the things that make it sound like [N.E.'s] been living with her. And you got witnesses that know the family. But won't gain anything personally regardless of what happens to [N.E.]. And so, I think that we can't let the specter of a bloody child scare us into finding kids in need of services and having them continue to be placed in foster care, out of their parents' home, when we do have at least one parent who's here to say, "She's never been bloody in my care and she won't be."

*Id.* at 162–63. The juvenile court then issued an order in which it found that N.E. was a CHINS, included a summary of each witness's testimony from the hearing,[6] ordered N.E. to be a ward of the DCS with placement in continued foster care, and set the matter for disposition.

I believe that N.E. was properly determined to be a CHINS.[7] It is true that we do not know exactly why the juvenile court determined N.E. to be a CHINS—that is, whether the court believed that N.E. spent a good amount of time with Mother, N.E.'s legal custodian, and that the domestic violence in Mother's home was enough to support a CHINS determination *or* whether it believed that N.E. spent the majority of her time with Father and Grandmother and that Father was not an appropriate parent based on his own recent domestic violence conviction, among other things. However, I believe that the acts or omis-

---

6. I note that the summary of the testimony here serves no purpose. Because there are several conflicts in the evidence, the summary does not resolve these conflicts and therefore does not qualify as findings of fact.

7. Although the CHINS petition did not contain any specific allegations against Father, Father was named in the petition, appeared

before the court, was represented by an attorney, and freely took part in the CHINS proceedings. Notably, Father makes no due process argument on appeal concerning the lack of specific allegations regarding him in the CHINS petition. Therefore, I believe that Father tried his own conduct by implied consent.

sions of one parent (especially the custodial parent) can support a CHINS determination and that there is not a separate analysis for each parent in the CHINS determination stage. That said, once a child is determined to be a CHINS, the juvenile court, at the dispositional stage, must analyze each parent separately to determine where to place the child.

Here, the juvenile court held the disposition hearing on May 30, 2008, and thereafter issued the following order, which pertained not only to N.E. but also to some of Mother's other children and their fathers:

The Court finds that reasonable efforts have been offered and available to prevent or eliminate the need for removal from the home. After reviewing the reports and information from the Office of Family and Children, service providers and other sources, which the Court now incorporates into this order (see Court file), the Court also finds that the services offered and available have either not been effective or been completed that would allow the return home of the children without Court intervention.

The Court finds that it is contrary to the health and welfare of the children to be returned home and that reasonable efforts have been made to finalize a permanency plan for the children.

The Court orders the children to be wards of the Marion County Office of Family and Children. The Court orders that the responsibility for placement and care of the child is ordered to the Marion County Office of Family and Children, with placement at: continued in foster care.

The Court proceeds to disposition and adopts the Pre–Dispositional Report of the Division of Family and Children and incorporates same as the findings of the Court, including plan of permanency which is hereby ordered. The Court also orders the Parental Participation, which is made a part of the order.

The Court now orders the children removed from the care of [Mother] and father[s], [ ] and [Father] pursuant to this Dispositional Order.

Appellant's App. p. 63. According to Indiana Code § 31–34–19–10, however, the dispositional order must be very detailed and specific:

(a) The juvenile court shall accompany the court's dispositional decree with written findings and conclusions upon the record concerning the following:

(1) The needs of the child for care, treatment, rehabilitation, or placement.

(2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.

(3) Efforts made, if the child is a child in need of services, to:

(A) prevent the child's removal from; or

(B) reunite the child with;

the child's parent, guardian, or custodian in accordance with federal law.

(4) Family services that were offered and provided to:

(A) a child in need of services; or

(B) the child's parent, guardian, or custodian;

in accordance with federal law.

(5) The court's reasons for the disposition.

(b) The juvenile court may incorporate a finding or conclusion from a predispositional report as a written finding or conclusion upon the record in the court's dispositional decree.

I believe that the trial court's dispositional order here falls woefully short of the statutory requirements. This is especially so since the order covered four fathers and multiple children. The dispositional order

is generic and contains nothing specific to Father. Although Indiana Code § 31–34–19–10(b) allows a juvenile court (which the court did here) to incorporate a finding or conclusion from a predispositional report as a written finding or conclusion upon the record in the court's dispositional decree, there is nothing in the predispositional reports directed at Father. The bottom line is that we do not know the juvenile court's reasons for its disposition. Ind.Code § 31–34–19–10(a)(5).

The lack of adequate findings is important because Indiana Code § 31–34–19–6 provides:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
> (A) *in the least restrictive (most family like) and most appropriate setting available;* and
>
> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

(Emphasis added). In addition, Indiana Code § 31–34–19–7 provides:

> In addition to the factors under section 6 of this chapter, if the court enters a dispositional decree regarding a child in need of services that includes an out-of-home placement, the court shall consider whether the child should be placed with the child's suitable and willing blood or adoptive relative caretaker, including a grandparent, an aunt, an uncle, or an adult sibling, before considering other out-of-home placements for the child.

In light of the importance of placing a child in the least restrictive and most family-like setting and preference for placing the child with a suitable and willing blood relative and because we do not know the trial court's reason for its disposition regarding Father, I would remand this case for a new dispositional order pursuant to Indiana Code § 31–34–19–10.

Although the majority is also remanding this case, it is doing so for "the juvenile court to determine whether Father is willing and able to appropriately parent N.E.[8] since N.E. is a CHINS with respect to Mother." Op. at 89. Because I disagree with the general premise that a CHINS determination can be separated for each parent, agree with the juvenile court's CHINS determination, and would remand only for dispositional purposes, I therefore dissent.

---

8. I note that it is unclear from what CHINS statute this standard comes.