**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 08 2012, 9:05 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**MATTHEW K. HAGENBUSH**
DCS, Dearborn County Office
Lawrenceburg, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE: TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: <br><br> K.T.K., K.C., & K.R.K., (Minor Children) <br><br> and <br><br> T.K. (Father), <br><br>     Appellant-Respondent, <br><br>     vs. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>     Appellee-Petitioner. | No. 15A01-1201-JT-14 |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-1101-JT-1; 15C01-1101-JT-2; 15C01-1101-JT-3

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-respondent T.K. (Father) appeals the termination of parental rights as to his three minor children, K.T.K., K.C., and K.R.K. Specifically, Father argues that the Indiana Department of Child Services (DCS) failed to establish by clear and convincing evidence that the conditions resulting in the children's continued placement outside the home would not be remedied. Father also argues that the DCS did not prove that termination of his parental rights was in the children's best interests. Concluding that the DCS met its burden, we affirm the judgment of the juvenile court.

FACTS

K.T.K. was born on October 21, 2000, K.C. was born on April 13, 2009, and K.R.K. was born on December 5, 2003. The DCS first became involved in this case in 2009, when it was reported that Mother was nonresponsive due to possible use of narcotics and was unable to respond to her children's needs or ensure their safety.

On August 28, 2009, Mother submitted to a drug test with the result being positive for oxycodone. However, she was not able to provide a valid prescription for the drug. Although she produced a prescription the next day, it was from April 15, 2009 and was only for forty pills.

2

On September 30, 2009, DCS received a report indicating two days earlier that Mother was found unconscious in a vehicle, with her infant son in the car.

When the DCS made the report, Mother indicated that:

She had no recollection of the event;

On September 30, 2009, she used drugs by snorting hydrocodone in the morning and xanax in the afternoon;

She does not have any current prescriptions for pain medicines; and

She had substance abuse issues and had a desire to quit.

Appellant's App. p. 30. Thereafter, DCS removed the children and placed them with a relative. Mother admitted to the CHINS allegations at the January 15, 2010 fact finding hearing. Mother also had various other substance abuse issues dating back to 1998, that included cocaine, morphine, marijuana, and heroin abuse.

Father was incarcerated in the Indiana Department of Correction (DOC) when the DCS removed the children and for the entire duration of the proceedings. Father's current incarceration stems from a probation violation on his original sentence for dealing in cocaine that was imposed in 2004.

Although the DCS offered no services to Father because he was incarcerated, the DCS case manager kept in contact with Father, updated him whenever major case changes occurred, and ensured his telephonic availability for hearings. While incarcerated, Father attended Ball State University and earned an associate's degree, as well as a journeyman apprenticeship through the U.S. Department of Labor. The DCS

3

case manager indicated that the services and programs that Father was involved in while incarcerated would probably not be the programs needed for reunification with the children.

Although Father kept in contact with the children through letters, and the children wanted to visit with Father, the therapist recommended that they not go into a prison setting. Father also had a criminal history that spanned his children's lives even before the DCS became involved in the current proceedings. More specifically, on August 27, 2004, Father pleaded guilty to dealing in cocaine as a class B felony. He was subsequently sentenced to fourteen years of incarceration with eight years suspended. In imposing that sentence, the trial court noted that Father had committed six criminal offenses since 1997 and considered this an aggravating factor that outweighed any of Father's mitigating factors. Some of those offenses included felony DUI convictions and habitual offender findings. Father admitted to having issues with alcohol abuse.

Father was released from prison on the dealing conviction in March 2006. At that time, he moved in with Mother and the two older children who were then five and two years old. Although Father and Mother attempted to reconcile, they divorced in October 2007. Father had two probation violations that involved drug dealing convictions. The first one resulted in his incarceration from February 7, 2007, until August 8, 2007, for a DUI. The second violation was the result of Father's conviction for another DUI and his subsequent conviction of driving on a suspended license. Based on Father's actions, the

4

trial court revoked his probation and sentenced him to seven years. Father has remained incarcerated through the pendency of the instant proceedings.

On January 5, 2011, the DCS filed a petition for the involuntary termination of the parent-child relationship. Following several hearings on the petition, the trial court entered an order on October 13, 2011, terminating Mother and Father's parental rights as to all three of the children. The trial court subsequently entered an amended order on January 11, 2012. In relevant part, the order provided that

> 15. Father's significant criminal history is reflective of his priorities and his choices. Father chose to break the law and in doing so jeopardized his children's well being and his ability to have a relationship with them.
>
> 16. Father's criminal history further gives little [or] no assurance that his recent positive efforts will translate to a commitment to obey the law in order to provide the stability, structure, and care that his children require.
>
> 17. The children [are] well-adjusted and well taken care of in their current foster home, and the foster parents have expressed willingness to adopt.
> . . .
> 19. Any reunification effort with the children is likely to be lengthy and difficult for them, as discussed by [the physicians]. The process could take as long as another year. The children have already been in care since October 2009, and permanency is paramount for children.
>
> 20. The parents are responsible for the upheaval in the children's lives by and through their own actions.
>
> 21. Both [the case manager] and the GAL . . . testified that it was their belief that termination was in the best interest of the children and that a reasonable probability existed that the reasons for removal and/or continued placement outside the home would not be remedied.

Father now appeals.[1]

DISCUSSION AND DECISION

I. Standard of Review

We initially observe that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to raise their children. Troxel v. Granville, 530 U.S. 57, 65 (2000); Bester v. Lake Cnty Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). But parental rights are not absolute and must be subordinated to the child's interest in determining the proper disposition of a petition to terminate parental rights. In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004). Thus, "parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." Id. at 265. The purpose of terminating parental rights is not to punish parents but to protect their children. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

When reviewing the termination of parental rights, we will neither reweigh the evidence, nor judge the credibility of the witnesses. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment below. Id. Here, the juvenile court made specific findings and conclusions in its order terminating Mother and Father's parental rights. Where the juvenile court enters specific findings and conclusions, we apply a two-tiered standard of review. Bester, 839 N.E.2d at 147. We first determine whether the evidence

---

[1] The children's mother, R.C. filed a separate appeal. However, her appeal was subsequently dismissed.

6

supports the findings, and then whether the findings support the judgment. <u>Id.</u> We will

not set aside the juvenile court's judgment unless it is clearly erroneous. <u>In re A.A.C.</u>,

682 N.E.2d 542, 544 (Ind. Ct. App. 1997). A judgment is clearly erroneous when the

evidence does not support the findings or the findings do not support the result. <u>In re</u>

<u>S.F.</u>, 883 N.E.2d 830, 834 (Ind. Ct. App. 2008).

The elements that DCS must allege and prove by clear and convincing evidence in

order to effect the termination of parental rights is controlled by Indiana Code section 31-

35-2-4(b)(2), wherein it states:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

7

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

## II. Conditions Remedied

As discussed above, Father claims that the juvenile court erred when it determined that there is a reasonable probability that the conditions that resulted in the children's removal and the reasons for the placement outside the parents' home will not be remedied.

When determining whether the conditions that led to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his child at the time of the termination hearing. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). However, the juvenile court's inquiry must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id. The court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 202 n.13 (Ind. Ct. App. 2003). The juvenile court may also consider the services offered to a parent and his or her response to those services. In re M.S., 898 N.E.2d 307, 311 (Ind. Ct. App. 2008).

Also, a parent's history of incarceration and the effects upon the children is a relevant consideration. In re A.A.C., 682 N.E.2d at 545. Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. Matter of A.C.B., 598 N.E.2d 570, 572 (Ind. Ct. App. 1992).

In this case, although Father obtained a college degree and maintained a high grade point average while doing so, his criminal history is extensive, and he has been incarcerated multiple times during his adult life. Father's criminal history includes a probation violation that resulted in his current incarceration, and there is no indication on the record that he obtained subsequent substance abuse treatment.

We are mindful of our Supreme Court's opinion in G.Y., where the trial court's termination of a mother's parental rights was reversed because the evidence did not support the trial court's conclusion that termination was in the child's best interest.

In G.Y., Mother had testified about programs that would help her find employment and a place to live, and she had consistent, positive, and appropriate visits with her child. Ultimately, the G.Y. court held that

> We agree with Mother that there was no evidence presented to show that permanency through adoption would be beneficial to [G.Y.] or that remaining as a foster care ward until he could be reunited with his mother would be harmful to [G.Y.]. This is especially true given the positive steps Mother has taken while incarcerated, her demonstrated commitment and interest in maintaining a parental relationship with G.Y., and her willingness to participate in parenting and other personal improvement programs after her release.

9

904 N.E.2d at 1265.

Here, there is also no indication that Father attempted to provide for the children prior to the initiation of the CHINS cases. In other words, Father has made himself unavailable to the children for the vast majority of their lives. And Father acknowledges that his criminal behavior left "him unavailable to his children when they needed him." Appellant's Br. p. 16. Father also did not participate in any parenting services or classes during his incarceration.

Father's failure to abide by the law resulted in the children being placed in imminent danger by Mother's drug use that eventually led to the children's removal. Moreover, Father's criminal history constitutes clear and convincing evidence that a reasonable probability exists that he will offend again, thus placing the children in the exact same situation that they have been in all of their lives.

Indeed, the juvenile court carefully considered and even commended Father's efforts, but nonetheless concluded that it was entitled to weigh Father's criminal history more heavily than the recent remedial efforts. The trial court explicitly determined that Father's significant criminal history is "reflective of his priorities and choices" and that Father "chose to break the law and in doing so jeopardized his children's wellbeing and his ability to have a relationship with them." Appellant's App. p. 340.

From the evidence presented, the trial court reasonably concluded that there was a reasonable probability that the conditions which resulted in the children's removal would

not be remedied. In effect, Father's claims amount to an invitation to reweigh the evidence—an invitation that we decline.

### III. Best Interests

Father also argues that the evidence was not sufficient to support the trial court's conclusion that terminating his parental rights was in the children's best interests. In essence, Father maintains that the termination order must be set aside because DCS failed to present any evidence that the current arrangement in foster care is detrimental to the children beyond the accepted notion that children are better off in a stable permanent environment.

In determining the best interests of the child, the juvenile court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development are permanently impaired before terminating the parent-child relationship. In re A.A.C., 682 N.E.2d at 545. Recommendations of the case manager and CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convicting evidence that termination is in the child's best interests. J.S., 906 N.E.2d at 236.

In this case, Father ignores Dr. Edward Conner's testimony regarding his concerns about a parent who has committed multiple criminal acts, some of which were committed after being released and how children can model this behavior. Tr. p. 190-91. Dr.

11

Conner, a licensed clinical psychologist, opined that a parent who continually makes choices that makes him unavailable to parent his children has a "degree of self-centeredness that is not conducive to parenting." Id. at 191. Father has not been able to provide a stable environment for the children. His criminal activities have dominated the children's lives more so than any effort he took while he was not incarcerated. Dr. Conner also opined about the children's needs for attachment and the effect on the children since they had been removed from the parents' residence in October 2009.

DCS case manager Heather Hardman and the children's therapist, Jack Hopkins, both testified to the pressing need for the children to have stability in their lives. Specifically, Hardman testified that

> These children need permanency, they have been bounced around, they have been in care for too long, the uncertainty they . . . went through in the last year and a half has tore them, they just want to be normal kids from talking with them, they need a permanent stable environment where they can just grow up and just know that things are going to be stable for them, they have a lack of trust right now in their parents, they want things just to be normal and I think they deserve that.

Tr. p. 38, 44.

Hopkins testified that the children expressed feelings of safety and security with regard to the foster home where they were currently staying. Id. at 103, 105. Hardman and the GAL testified that they concurred with the DCS personnel's recommendation of termination and believed that such action was in the children's best interests, noting significant issues with Mother as well as Father's lengthy incarceration and criminal history. Tr. p. 38-40, 42, 201-04.

12

Father's assertion that he has taken advantage of the options available to him in the penal system fails when viewed in light of the years of opportunity he has had to use those resources to his advantage to become a law abiding citizen and parent his children appropriately. When all of the evidence and testimony is examined and viewed in totality, which includes: recommendations to terminate the parent-child relationship from the case manager, the CASA, and the doctors and therapists' testimony, that the children have flourished in foster care, and that Father has demonstrated an inability to adequately provide for the safety and well-being of the children, we cannot say that the juvenile court's determination that it was in the children's best interest that the parent-child relationship be terminated was clearly erroneous. Thus, we decline to set aside the termination order.

The judgment of the juvenile court is affirmed.

KIRSCH, J., and BROWN, J., concur.