**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 28 2012, 8:48 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**WESLEY D. SCHROCK**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**DOROTHY FERGUSON**
Indiana Dept of Child Services
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION  )
OF THE PARENT-CHILD RELATIONSHIP:  )
                  )
T.V. (Minor Child),  )
                  )
      and  )
                  )
M.M. (Father),  )
                  )    No.  48A02-1112-JT-1178
    Appellant-Respondent,  )
                  )
      vs.  )
                  )
THE INDIANA DEPARTMENT OF CHILD  )
SERVICES,  )
                  )
    Appellee-Petitioner.  )

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable G. George Pancol, Judge
Cause No. 48D02-1101-JT-5

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-respondent M.M. (Father) appeals the termination of parental rights as to his minor daughter, T.V. Specifically, Father argues that appellee-petitioner, the Indiana Department of Child Services (DCS), failed to establish by clear and convincing evidence that the conditions resulting in T.V.'s continued placement outside the home would not be remedied or that the continuation of the parent-child relationship posed a threat to T.V. Father also argues that the DCS did not prove that termination of his parental rights was in T.V.'s best interest. Concluding that the DCS met its burden, we affirm the judgment of the juvenile court terminating Father's parental rights as to T.V.

<u>FACTS</u>

Sometime in 2004, the DCS substantiated a report of child molestation against Father, and he was subsequently adjudicated and sentenced to fifteen months at a treatment facility in Indianapolis. Father was fifteen years old when he committed the offense, and the victim was twelve.

T.V. was born on December 1, 2006, to B.C. (Mother) and Father. At the time of T.V.'s birth, Father was "on the run" from law enforcement agencies for crimes that he had committed the previous August. Appellant's App. p. 18. Thus, Father had very

limited contact with T.V. Father was eventually arrested and pleaded guilty to aggravated battery and criminal gang activity and was sentenced to fifteen years at the Indiana Department of Corrections (DOC), with ten years executed.

On July 24, 2008, the DCS filed a petition alleging that T.V. was a Child in Need of Services (CHINS). The petition claimed that Mother lacked adequate housing and could not provide for T.V.'s basic needs. Although Mother had previously denied the CHINS allegations, she told her caseworker on the day of the hearing on August 7, 2008, that she felt incapable of caring for T.V.

Following the hearing, the juvenile court removed T.V. from Mother's care and placed her in foster care. Although Father was present at the hearing, T.V. could not be placed with him because he was incarcerated at the Pendleton Correctional Facility. At a subsequent dispositional hearing in September 2008, the juvenile court ordered Father to establish paternity, and Mother was ordered, among other things, to find employment and participate in parenting services.

After repeated in-home trial visits with Mother were unsuccessful, T.V. was returned to foster care in December 2009. Father was still incarcerated and unable to care for T.V. At some point, it was determined that T.V. has oppositional defiant disorder and is autistic.

On February 15, 2011, the DCS filed a petition to terminate the parental rights of both Mother and Father. At the termination hearing that commenced on October 18, 2011, it was determined that Father has had no substantial relationship with T.V. and has

had no personal contact with her since his incarceration on April 23, 2007. It was also established that Father has a lengthy juvenile adjudication and criminal history. In addition to the adjudication for child molesting conviction mentioned above, Father had also been arrested for dealing in marijuana, which was eventually pled down to visiting a common nuisance. In 2001, Father violated his probation by admittedly using marijuana.

The evidence at the termination hearing also showed that Father did not write to T.V. until March 2011. One letter that Father sent included photographs of T.V.'s grandmother and a paternal half-sister. T.V. was over four years old when she saw the pictures, and she did not recognize anyone in the photos.

Although Father's incarceration did not permit the DCS to offer services or provide visitations, he did not participate in any programs through the DOC—including parenting classes—that Father admitted that he needed. Father has never maintained his own residence and described his housing plans after release from prison by indicating that he intended to "move in with [his] mother."[1] Tr. p. 50, 56. Father testified that she lived in "section 8 housing" in Marion, but no physical description of the housing was provided. Id. at 50. Father also had not taken any steps toward continuing his schooling or obtaining employment after his release from incarceration.

T.V. and her siblings were placed with the same foster parents and their children. They have remained with the same family for over two years. The juvenile court

---

[1] The DCS had previously substantiated child abuse and instances of neglect against T.V.'s grandmother. Thus, she was not considered a placement option at the time of T.V.'s removal. Tr. p. 63-64, 66-67.

considered the report of Court Appointed Special Advocate (CASA) Hilary Snyder when deciding whether the termination of Father's parental rights was in T.V.'s best interests. Snyder recommended that T.V. remain in her current foster care placement, and she believed that it was in T.V.'s best interest that Father's parental rights be terminated.

DCS family case manager Dawn Seals also testified that she believed that it was in the best interest of T.V. that Father's parental rights be terminated, and she supported the plan of adoption by the current foster parents. Seals did not believe that T.V. recognized Father, and she determined that delaying termination of Father's parental rights until Father is released from incarceration and rehabilitated would be unfair to T.V. Seals thought that permitting T.V. to remain in foster care was the only fair option. Finally, Seals testified that T.V. had bonded with her foster mother and thought that she was doing well in the foster home.

Although T.V. was found to have experienced educational and behavioral issues initially, those concerns had been mitigated and T.V. was performing well in school at the time of the termination hearing. The evidence demonstrated that T.V. is being treated regularly for her autism, is bonded to her siblings, and relates to the pre-adoptive family's children as if they were her siblings.

On December 7, 2011, the juvenile court entered findings of fact and conclusions of law, terminating Father's parental rights as to T.V.[2] In particular, the juvenile court

---

[2] Mother voluntarily terminated her parental rights as to T.V. and consented to adoption.

determined that Father has "never had any meaningful contact with his child" and was "unable to care for his child" at the time of the proceeding. Appellant's App. p. 14.

The juvenile court also noted that Father has been incarcerated for the majority of T.V.'s life for violent crimes in addition to his juvenile criminal history that included the child molest adjudication. It was also pointed out that both the CASA and the case manager recommended that it was in T.V.'s best interest that the juvenile court terminate Father's parental rights. Father now appeals.

DISCUSSION AND DECISION

I. Standard of Review

We initially observe that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to raise their children. Troxel v. Granville, 530 U.S. 57, 65 (2000); Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). But parental rights are not absolute and must be subordinated to the child's interest in determining the proper disposition of a petition to terminate parental rights. In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004). Thus, "parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." Id. at 265. The purpose of terminating parental rights is not to punish parents but to protect their children. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

When reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of the witnesses. In re G.Y., 904 N.E.2d 1257, 1260

6

(Ind. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment below. Id. Here, the juvenile court made specific findings and conclusions in its order terminating Father's parental rights. Where the juvenile court enters specific findings and conclusions, we apply a two-tiered standard of review. Bester, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, and then whether the findings support the judgment. Id. We will not set aside the juvenile court's judgment unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). A judgment is clearly erroneous when the evidence does not support the findings or the findings do not support the result. In re S.F., 883 N.E.2d 830, 834 (Ind. Ct. App. 2008).

The elements that the DCS must allege and prove by clear and convincing evidence in order to effect the termination of parental rights are set forth in Indiana Code section 31-35-2-4(b)(2), which provides

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is

7

removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

We note that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, which requires that only one of the two sub-elements under section (B) be proven true by clear and convincing evidence. In re L.S., 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

## II. Father's Claims

## A. Conditions Remedied

Father contends that the termination of parental rights order must be set aside because the DCS failed to adequately establish that the conditions resulting in T.V.'s removal would not be remedied. Specifically, Father argues that the termination order cannot stand because he turned himself in to law enforcement officials demonstrating his responsibility, and the evidence established that he and T.V. would be able to live with his mother.

8

When determining whether the conditions that led to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his child at the time of the termination hearing. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). However, the juvenile court's inquiry must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

The juvenile court may properly consider a parent's history of neglect, failure to provide support, lack of adequate housing, and lack of employment, among other things. McBride v. Monroe Cnty. OFC, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The juvenile court may also consider the services that the DCS has offered to a parent and the response to those services. In re M.S., 898 N.E.2d 307, 311 (Ind. Ct. App. 2008).

A parent's history of incarceration and the effects upon the children is also a relevant consideration. In re A.A.C., 682 N.E.2d at 545. Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. In re A.C.B., 598 N.E.2d 570, 572 (Ind. Ct. App. 1992). Finally, the DCS is not required to rule out all possibilities of change. Rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007) (emphasis added).

As discussed above, Father was incarcerated for nearly all of T.V.'s life, and he has had minimal written contact with her. Tr. p. 26-27, 53-54. Although Father participated in the underlying CHINS proceedings from at least September 18, 2008, he

9

did not make any written contact with T.V. until March 2011. While Father's incarceration prevented the DCS from offering services directly to him or providing him with visitation opportunities, Father did not participate in programs that were offered through the DOC, including the parenting classes that Father admits that he needs. Id. at 32, 42, 52.

The evidence also demonstrated that even if Father is released at the earliest possible date, he will be on probation for five more years and will have to begin services at that point. DCS Ex. Vol V, 171. Additionally, Father has repeatedly violated his probation, has been incarcerated since T.V. was five months old, and has not seen her for nearly four years.

Although Father claims that the juvenile court failed to make findings on his current circumstances and based its decision solely on his historical behavior, it was established that Father was unavailable for placement of T.V. at any time during the CHINS case because of his incarceration. And because Father remained imprisoned at the time of the termination evidentiary hearing, incarceration was, indeed, his current circumstance. The fact that those circumstances were the same at the time of both the CHINS finding and the evidentiary hearing is precisely the point that the juvenile court made clear in its order.

Also, Father's statements about his future intentions to find employment and secure housing are insufficient to disprove that the conditions resulting in T.V.'s removal or placement out of the home are likely to continue. See In re B.D.J., 728 N.E.2d 195,

10

202 n.1 (Ind. Ct. App. 2000) (observing that a parent's future plans were not evidence upon which a trial court could base its termination decision because the parent's fitness to care for the children must be assessed as of the time of the hearing). Also, Father's plan to move in with his mother is cause for more concern rather than a plan for T.V.'s safe care. In particular, his mother was not given placement of T.V. during the CHINS case because of prior DCS substantiations of abandonment, lack of supervision, and educational neglect of other children in her residence. Tr. p. 66-68.

Under these circumstances, it is apparent that Father has not been able to elevate his capacity to parent T.V., despite the time allowed for him to do so. The CHINS case involving T.V. had been pending for twenty-nine months before the termination petition was filed and thirty-eight months prior to the termination trial. From the evidence presented, the juvenile court could properly conclude that there was a reasonable probability that the conditions which resulted in T.V.'s removal would not be remedied. In effect, Father's claims amount to an invitation to reweigh the evidence—an invitation that we decline.[3]

### B. Best Interests

Father also argues that the evidence was not sufficient to support the juvenile court's conclusion that terminating his parental rights was in T.V.'s best interest. Specifically, Father maintains that there was no evidence presented that permanency

_____

[3] As noted above, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, we need not address Father's contention that the DCS failed to show that there was a reasonable probability that continuation of the parent-child relationship posed a threat to T.V. In re L.S., 717 N.E.2d at 209.

11

through adoption would be beneficial to T.V. and that there was "no evidence that remaining in foster care until reunification would be harmful to [T.V.]." Appellant's Br. p. 16.

In determining the best interests of the child, the juvenile court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development are permanently impaired before terminating the parent-child relationship. In re A.A.C., 682 N.E.2d at 545. Recommendations of the case manager and the CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. J.S., 906 N.E.2d at 236. A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children. Lang v. Starke Cnty OFC, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007). The juvenile court properly considers evidence of a parent's history of neglect, failure to provide support, and lack of adequate housing and employment. Matter of D.G., 702 N.E.2d 777, 779 (Ind. Ct. App. 1998).

In support of his contention, Father directs us to our Supreme Court's opinion in G.Y., where the juvenile court's termination of a mother's parental rights was reversed

because the evidence did not support the trial court's conclusion that termination was in the child's best interest.

In G.Y., Mother had testified about programs that would help her find employment and a place to live, and she had consistent, positive, and appropriate visits with her child. Ultimately, the G.Y. court held that

> We agree with Mother that there was no evidence presented to show that permanency through adoption would be beneficial to [G.Y.] or that remaining as a foster care ward until he could be reunited with his mother would be harmful to [G.Y.]. This is especially true given the positive steps Mother has taken while incarcerated, her demonstrated commitment and interest in maintaining a parental relationship with G.Y., and her willingness to participate in parenting and other personal improvement programs after her release.

904 N.E.2d at 1265.

Unlike the circumstances in G.Y., Father had only limited contact with T.V. prior to his incarceration because he was attempting to evade capture by law enforcement officials at the time of T.V.'s birth. Tr. p. 44, 55. As noted above, Father did not participate in any programs through the DOC during his incarceration. Id. at 32, 42, 52. Father also made no preliminary steps toward post-incarceration schooling or employment. Tr. p. 43-61.

Although Father participated in the CHINS case from September 2008, he did not make any written contact with T.V. until March 2011. T.V. has not seen Father for more than four years, and the case manager does not believe that T.V. recognized Father. Also

13

as discussed above, upon release, Father planned to live with his mother, who has a history with the DCS of neglect, abandonment, and child abuse.

Additionally, CASA Snyder reported, and case manager Seals testified, that they believed termination of Father's parental rights to be in T.V.'s best interests. Id. at 32-34. Also, contrary to Father's contentions, the juvenile court did not terminate the parent-child relationship because of Father's criminal history, but because that history and the resulting incarcerations significantly impair his ability to safely parent T.V.

Finally, Father directs us to In re I.A., 934 N.E.2d 1127, 1136 (Ind. 2010), in support of the proposition that T.V. will not be harmed by extending the CHINS wardship to permit Father the opportunity to prove that he could care for T.V. after his release from prison. In I.A., the father had complied with the DCS case plan, increased somewhat his ability to fulfill parental obligations, visited regularly with the child, and cooperated fully with the DCS. Id. at 1130-31. In short, the father had done everything that was asked of him, resulting in the conclusion that there would be "little harm in extending the CHINS wardship. . . ." Id. at 1136. As discussed above, the circumstances in I.A. are not present here.

In short, we cannot say that the juvenile court's determination that it was in T.V.'s best interest that Father's parental rights be terminated is clearly erroneous. Thus, we decline to set aside the termination order.

The judgment of the juvenile court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.