**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 12 2014, 10:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LAWRENCE D. NEWMAN**
Newman & Newman, P.C.
Noblesville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINA D. PACE**
Deputy Attorney Generals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| G.M. (Minor Child), | ) ) | |
| and | ) ) | |
| R.M. (Mother), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No.  29A05-1310-JT-509 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Steven R. Nation, Judge

**June 12, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-respondent R.M. (Mother) appeals the termination of her parental rights as to her son, G.M. More particularly, Mother argues that the Indiana Department of Child Services (the DCS) failed to prove, by clear and convincing evidence, that the conditions that resulted in the removal of G.M. would not be remedied or that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to G.M.'s well-being. However, we find that the DCS did prove that there was a reasonable probability that the conditions that resulted in G.M.'s removal would not be remedied and that the continuation of the parent-child relationship posed a threat to G.M.'s well-being. The DCS also has a satisfactory plan for G.M., which is adoption. Accordingly, we affirm the juvenile court's decision to terminate Mother's parental rights.

<u>FACTS</u>

G.M. was born to Mother on November 7, 2010.[1] G.M. was born with opiates and/or heroin in his system due to Mother's use of illegal drugs during her pregnancy.

---

[1] The juvenile court had previously terminated the parental rights of A.C., G.M.'s father. A.C. is not a party to this appeal.

Mother used illegal drugs throughout her pregnancy, and she used these drugs three days before G.M.'s birth, twelve hours from birth, and on her way to the hospital to deliver G.M. G.M. was hospitalized for approximately ten days following his birth because he was suffering from drug withdrawal symptoms. On November 15, 2010, the DCS removed G.M. from Mother's custody. With the juvenile court's authority, the DCS filed a petition alleging that G.M. was a child in need of services (CHINS).

On November 16, 2010, the juvenile court held an initial hearing, wherein it authorized G.M.'s placement in foster care. The juvenile court appointed an attorney for Mother and set the DCS petition for fact-finding. When G.M. was released from the hospital, he was placed with his maternal aunt (Aunt) and uncle (Uncle).

On March 8, 2011, the juvenile court held a factfinding hearing. Mother failed to appear but was represented by counsel. The juvenile court adjudicated G.M. a CHINS, and held an immediate dispositional hearing. It granted the DCS wardship of G.M., ordered Mother to engage in reunification services, and continued G.M.'s placement with Aunt and Uncle.

On August 12, 2011, Mother appeared at the permanency review hearing, where the juvenile court maintained the reunification plan, but found that Mother had failed to participate in services until June of 2011, had not communicated with the DCS, had been periodically incarcerated, had missed visitation with G.M. for approximately seven months, and had tested positive for illegal drugs. The juvenile court also found that G.M. was progressing well in placement.

A second permanency review hearing was held on November 4, 2011. The juvenile court found that Mother refused to take responsibility for continued positive drug screens, that Mother was not cooperating with the DCS or participating in any services, that Mother had taken up residence with a man who had a history of dealing illegal narcotics, and that Mother had lost custody of G.M.'s prior-born siblings. The juvenile court then instituted a plan for the termination of parental rights and adoption of G.M. All services for Mother were suspended.

On April 24, 2011, and October 6, 2012, the juvenile court again held permanency review hearings. The juvenile court maintained the termination of parental rights and adoption as the permanency plan, as Mother had failed to maintain contact with the DCS, refused to participate in the case, and failed to appear for hearings.

The DCS filed a petition to terminate Mother's parental rights in G.M. on December 5, 2011. However, Mother did not appear at the initial hearing on February 10, 2012. The juvenile court set the matter for a factfinding hearing after appointing a guardian ad litem for G.M. and counsel for mother.

On December 7, 2012, February 5, 2013, and May 31, 2013, the juvenile court conducted a factfinding hearing on the DCS petition to terminate parental rights. At the factfinding hearing session on December 7, 2012, Family Case Manager (FCM) Drew Dickerson, who took over Mother's case in July 2012, testified that Mother lived with her boyfriend, who had a history of criminal activity and drug abuse. He also testified that Mother could not provide documentation of any completed substance abuse program and

4

that she made no requests for resumed visitation with G.M. FCM Dickenson further testified that he believed G.M. was part of his adoptive family, that G.M. referred to Aunt and Uncle as "mother" and "father," and that he believed it was in G.M.'s best interests to terminate Mother's parental rights and allow Aunt and Uncle to adopt G.M.

At the factfinding hearing session on February 5, 2013, DCS FCM Jeri Gibson, who oversaw G.M.'s case from November 2010 until August 2012, testified that G.M. was released from the hospital into Aunt's care and never lived with Mother. He also testified that Mother was incarcerated more than once and did not contact him regarding her incarceration. FCM Gibson further testified that between June 2011 and November 2011, Mother continued to test positive for illegal drugs and that, rather than take responsibility for the positive drug screens, Mother would always have excuses as to why she would test positive or deny that the tests were accurate. FCM Gibson also testified that the extreme difficulty in contacting Mother made it difficult to do unannounced visits or random drug screens, and he told the juvenile court that drug screen results are easier to manipulate when the tested subject knows when she will be screened.

David Gilles, G.M.'s Guardian Ad Litem, testified at the factfinding hearing session on February 5, 2013. Giles, who had been involved with the case since February 2010, testified that, at the time he met Mother, she was incarcerated and that she admitted to him that she used heroin during her pregnancy. Gilles also testified that, although he gave Mother his information while she was incarcerated, she did not contact him until approximately six months later and remained unresponsive throughout his involvement in

5

the case. Mother told Gilles in June 2011 that she was no longer using illegal drugs; however, Mother tested positive for illegal drugs on June 23, 2011. Gilles testified that a strong bond never existed between Mother and G.M. and that he believed it was in G.M.'s best interests to terminate Mother's parental rights and allow Aunt and Uncle to adopt him.

Aunt, G.M.'s foster mother, also testified at the factfinding hearing on February 5, 2013. She testified that Mother did not take her drug abuse or the removal of G.M. seriously and that Mother refused to follow DCS protocol and attempted to directly contact Aunt to schedule unpermitted visitation. Aunt testified that Mother has talked about her drug use and that she has observed Mother under the influence of illegal drugs. Aunt also testified that her home with Uncle is the only home G.M. has ever known; they call him their son, and he calls them mom and dad. Aunt testified that she believed it would be traumatic for G.M. to be taken from their home and that G.M. does not know his biological mother.

Additionally, G.M.'s maternal Grandmother (Grandmother) testified on February 5, 2013. Grandmother testified that Mother had a history of substance abuse, which has caused Grandmother to raise two of G.M.'s older siblings. Grandmother testified that none of Mother's older children live with Mother. Grandmother also testified regarding Mother's housing situation, stating that Mother was transient for eighteen months from 2007 to 2009 until she appeared to stabilize while living at the Third Phase shelter. However, Mother then left the shelter and refused to return and also refused to move in

6

with Grandmother. Grandmother testified that Mother had admitted to her that she had been arrested for prostitution and that Mother had denied being pregnant with G.M. up until two months before his birth. Mother did not tell Grandmother when G.M. was born or communicate that G.M. had been removed from Mother's care by the DCS. Grandmother testified that she believes that placement with Aunt and termination of Mother's parental rights would be in G.M.'s best interest.

Jimmy Eldridge, Mother's husband, testified at the factfinding hearing session on May 31, 2013. He testified that he has been convicted of possession of a controlled substance with intent to deliver on two separate occasions and that prior to those convictions he was convicted of two other possession charges. Eldridge also testified that, while he was aware of Mother's positive drug screens, he does not accept the accuracy of the screens. Eldridge admitted that Mother was arrested for possessing paraphernalia in April 2012 and testified that Mother allowed individuals she did not know to use her home to have packages delivered that contained illegal drugs, but that he believed that all charges against mother related to the deliveries had been dropped by the date of his testimony. Jimmy has never met G.M.

Mother also testified on May 31, 2013. She testified that she became addicted to pain medication following a car crash and has used illegal drugs since at least 2007. Mother began using heroin in 2008 or 2009, and she overdosed in 2009 and had to be resuscitated back to life and spent three months in jail due to the incident. Mother then went into treatment, and maintained sobriety for seven months. On the day Mother

7

delivered G.M., she was suffering from withdrawal from Suboxone; Mother admitted to using heroin on the way to the hospital to deliver G.M. Mother also testified that she has convictions for driving with a suspended license, theft, prostitution, and for visiting a common nuisance. Mother also admitted that she was incarcerated on the date of the factfinding and dispositional hearing in the CHINS case on March 8, 2011. Mother pleaded guilty to visiting a common nuisance approximately two weeks before the final termination hearing. Mother also testified that she was homeless on or about December 2010, and stated that she chose to decline to participate in DCS services prior to June 2011. Mother testified that she was sober by June 2011, and denies the accuracy of any positive drug screen.

After the factfinding hearing, the juvenile court took the matter under advisement. On September 17, 2013, the juvenile court issued its findings of fact and conclusions of law; it found that there was a reasonable probability that the conditions that led to G.M.'s removal would not be remedied and that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to G.M.'s well-being. Therefore, the juvenile court terminated Mother's parental rights in G.M.

Mother now appeals.

DISCUSSION AND DECISION

I. Standard of Review

We initially observe that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to raise their children. Troxel v.

Granville, 530 U.S. 57, 65 (2000); Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). However, parental rights are not absolute and must be subordinated to the child's interest in determining the proper disposition of a petition to terminate parental rights. In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004). Thus, "parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." Id. at 265. The purpose of terminating parental rights is not to punish parents but to protect their children. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

When reviewing the termination of parental rights, we neither reweigh the evidence nor judge the credibility of the witnesses. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment below. Id. Here, the juvenile court made specific findings of fact and conclusions of law in its order terminating Mother's parental rights.

Where the juvenile court enters specific findings and conclusions, we apply a two-tiered standard of review. Bester, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, and then whether the findings support the judgment. Id. We will not set aside the juvenile court's judgment unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). A judgment is clearly erroneous when the evidence does not support the findings, or the findings do not support the result. In re S.F., 883 N.E.2d 830, 834 (Ind. Ct. App. 2008).

9

The elements that the DCS must allege and prove by clear and convincing evidence in order to effect the termination of parental rights are set forth in Indiana Code section 3l-35-2-4(b)(2), which provides:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
. . .

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2).

10

We note that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, which requires that only one of the sub-elements, under subsection (B), be proven true by clear and convincing evidence. In re L.S., 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

## II. Termination of Mother's Parental Rights

### A. Conditions Remedied

Mother argues that the termination of parental rights order must be set aside because the DCS failed to prove that the conditions that led to G.M.'s removal will not be remedied. More particularly, Mother argues that the juvenile court focused too heavily on Mother's behavior before the termination proceedings began.

When determining whether the conditions that led to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). However, the juvenile court's inquiry must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

The juvenile court may properly consider a parent's history of neglect, failure to provide support, lack of adequate housing, and lack of employment, among other things. McBride v. Monroe Cnty. OFC, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The juvenile court may also consider the services that the DCS has offered to a parent and the response to those services. In re M.S., 898 N.E.2d 307, 311 (Ind. Ct. App. 2008).

The evidence at the termination hearing demonstrated that the conditions that led to the removal of G.M. have not been remedied. Specifically, Mother admitted that she

11

pleaded guilty to visiting a common nuisance approximately two weeks before the final factfinding hearing. Appellant's App. p. 64. She was also arrested on April 12, 2012 with the individuals she allowed to deliver illegal drugs to her home.

Moreover, the evidence demonstrated that Mother has been unable to successfully control her drug addiction. While Mother did participate in substance abuse treatment, home-based counseling, and visitation with G.M. for a period of time, she did not complete any recommended drug abuse treatment. She also continued to test positive for cocaine. Tr. p. 38, 39, 44, 49, 50, 57-59, 154, 162, 164, 170, 171. Mother also refuses to take responsibility for any of her positive drug screens and argues that the screens were not accurate. Appellant's App. p. 66. This failure to take responsibility for her addiction suggests that Mother will not seek adequate help for her addiction in the future.

Mother points out two errors in the juvenile court's findings of fact and claims that the evidence does not support the juvenile court's conclusions of law. First, she points to the juvenile court's finding that the DCS tried to make contact with mother on a weekly or biweekly basis from December 2010 through May 2012, arguing that the finding is incorrect. Id. at 61. Mother is correct that the finding should have stated that FCM Gibson tried to contact mother from December 2010 through May 2011.

Mother also argues that the juvenile court should not have included the finding concerning manipulation of drug screen tests, as this testimony was objected to by Mother's counsel. Mother is correct that her counsel objected to testimony concerning drug screening and that the court ordered it stricken from the record. However, the

remaining findings of fact support the juvenile court's conclusions of law, and this court has held that "to the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment." Lasater v. Lasater, 809 N.E.2d 380, 396 (Ind. Ct. App. 2004).

In light of these facts, it was proper for the juvenile court to conclude that there was a reasonable probability that the conditions that resulted in G.M.'s removal would not be remedied.

### B. Well-being of the Child

Mother also contends that termination of parental rights order must be set aside because the DCS failed to prove that the continuation of the parent-child relationship posed a threat to G.M.'s well-being.

As discussed above, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Because there was sufficient evidence for the juvenile court to conclude that there was a reasonable probability that conditions would not be remedied, the DCS is not required to prove that the continuation of the parent-child relationship posed a threat to G.M.'s well-being.

Nevertheless, "[w]hen the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." In re E.S., 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Here, Mother's drug use has already impacted and threatened G.M.'s well-being. Mother

used heroin on the way to the hospital to deliver G.M., and he suffered from withdrawal symptoms after his birth. Appellant's App. p. 88. Despite this harm to G.M., Mother has continued to use drugs. While she has sometimes maintained periods of sobriety, she has always relapsed into drug use. Id. at 91. Moreover, Mother currently lives with Eldridge, who also has a history of illegal drug use and drug crime convictions; she has also allowed individuals to have illegal drugs delivered to her home. Id. at 87. Therefore, we cannot say that the juvenile court's determination that the continuation of the parent-child relationship posed a threat to G.M.'s well-being was clearly erroneous.

The judgment of the juvenile court is affirmed.

BARNES, J., and CRONE, J., concur.