Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Dec 18 2014, 8:03 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GREGORY L. FUMAROLO**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**DAVID DICKMEYER**
Graduate Law Clerk
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF V.A. (Minor Child) and | ) ) ) ) | |
| A.A. (Father), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 02A04-1405-JT-233 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1307-JT-80

**December 18, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

A.A. ("Father") appeals the trial court's termination of his parental rights to his daughter, V.A. We affirm.

**Facts and Procedural History**

In April 2014, the trial court entered a termination order that reads in pertinent part as follows:

**THE COURT NOW FINDS AND CONCLUDES** that:

….

2. [V.A. was born to S.A. ("Mother") and Father] on August 3, 2010.

3. A Preliminary Inquiry was held in the underlying Child in Need of Services case … on August 22, 2012. At the time of Preliminary Inquiry, the [Department of Child Services' ("DCS")] caseworker Sara Drury met with the parents. The Mother advised that she was overwhelmed by the child and wanted her removed. Services were provided to the family by [DCS]. From caseworker Drury's testimony the Court finds that the Mother was verbally hard to follow and expressed unrealistic behavioral expectations of the child. The Mother expressed a belief that people were trying to read and control her mind over the internet. She was unwilling to follow a behavioral plan and the Father was unwilling to live separate from the Mother. Accordingly, the child was removed from their care.

4. An Additional Initial Hearing was held on September 19, 2012, and the case was referred for a Factfinding. Provisional Orders were entered. [DCS] was ordered to provide services and the parents were ordered to enroll in home based services. The Mother was directed to obtain a psychiatric evaluation at the Bowen Center.

5. A Factfinding was held on December 3, 2012. The Court found that the mother was diagnosed with schizo-[a]ffective disorder and, if left untreated, she may experience delusions, hear voices and/or manifest manic or depressive moods.…

2

6. The Court adjudicated the child to be a Child in Need of Services (CHINS) and a Dispositional Hearing was held.

7. On December 3, 2012, [the Court] entered a Dispositional Decree in the underlying child in need of services case and placed the child in licensed foster care. The Respondent Mother was granted visitation under the supervision of an agency contracted by [DCS]. A Parent Participation Plan was incorporated into the Dispositional Decree and the Respondent Mother was ordered to [do or refrain from doing certain things, including attending and appropriately participating in all visits with V.A. and enrolling in and successfully completing a therapeutic home based services program through the Bowen Center].

8. The Father was … granted unsupervised visits with the child and was placed under a parent participation plan. In addition to the requirements of the Mother …, he was ordered to:
   ….
   m. Seek advice and education regarding wife's mental illness and possible [effect] on children from therapist or other experts provided by [DCS].
   n. Enroll in therapeutic home based services program through Bowen Center, participate in all sessions, and successfully complete the program. (Masters Level services)

9. A Review Hearing was held on February 7, 2013 and the Court found that the Mother and Father had been involved in services and were demonstrating an ability to benefit from services. The child was continued in licensed foster care and the parents were granted therapeutic visitations.

10. Within a few months, at a July 31, 2013 Permanency Hearing, the Court found that the parents were not participating in therapy and that the Mother was not demonstrating an ability to benefit from services. The Court adopted a Permanency Plan of termination of parental rights.… The child was continued in licensed foster care.

….

13. Prior to the initiation of the underlying Child in Need of Services case, the Mother had a long history of mental health treatment. From the testimony of Park Center's Clinical Nurse Specialist and Advance[d] Practice Nurse, Karen Lothamer, the Court finds that:

3

[Mother was referred for Park Center medication management services in February 2009 following her hospitalization and diagnosis of schizoaffective disorder. In the following months, Mother was prescribed various medications and reported hearing voices in September 2009 and an increase in anger issues in November 2009.]

….

j.  On December 10, 2010 the Mother came to an appointment with her child. She reported that she was doing well with the medications as prescribed.

k.  On January 3, 2011 the Mother reported that she was again pregnant. The Geodon was discontinued. However, by January 26, 2011, the Mother reported that she was not pregnant and the Geodon prescription was restored.

l.  An additional [medication] review was held without incident on February 1, 2011. The Mother and the Respondent Father attended the appointment on April 8, 2011. She advised that she wanted to apply for disability and stated that her family doctor had provided her with sufficient prescriptions for two months. However, on May 20, 2011 the Mother appeared and reported that she was delusional. She stated that a worm was in her head laying eggs. As a result her medications were adjusted. On June 8, 2011, the Mother appeared and a prescription for Geodon was restored to "reduce the voices".

m.  On August 23, 2011, the Mother, Father, and child appeared. She again believed she was pregnant (from Nurse Lothamer's testimony the Court finds that Invega can cause a false positive pregnancy test result.) Optional medications were prescribed.

n.  On October 21, 2011 the Mother appeared and reported that she was out of her medications and was again hearing voices. Her medications were again adjusted.

o.  On November 18, 2011 the Mother and Father appeared. The Mother reported she heard voices directing her not to pick up the baby when the baby was crying. The nurse increased her medications and set up a three month appointment.

p.  On January 13, 2012, the Mother appeared and advised that she was doing well with her medications. A review appointment was set for April 9, 2012, however she did not appear.

q. The Mother was next seen on July 20, 2012. She and her husband came to Park Center with the baby. The Mother exhibited a rambling speech pattern, and was easily side tracked. The parents agreed not to allow the Mother to be alone with the child. The Mother and the Father also stated that the Mother did not need to take her [medications].

r. Following a second hospitalization at Parkview Behavioral Health the Mother was seen on November 19, 2012. The Father also appeared for this appointment. The Mother had again been prescribed Geodon. She complained of side effects and rambled about her rights. After calming her down the Mother agreed to a modified dosage. A follow up appointment was set for December, 2012 but the Mother did not appear.

14. From Nurse Lothamer's testimony the Court finds that the debilitating effects of the Mother's mental illness can be minimized and/or controlled by medications. Because the Mother has a life long illness she requires on-going medication management to maintain her stability. Nurse Lothamer assessed that the Father was supportive of what the Mother wanted but not what she needed. Nurse Lothamer opined that if the Mother is not on her properly prescribed medications a child in her care would be at risk.

….

17. Despite advising Nurse Lothamer that the Mother should not have to take her medications, [Father] admitted in his testimony that the Mother is better able to care for his daughter when she is taking her prescriptions. When the child was still in their care he made it a practice to call home from work every two hours to ensure all was well.

18. From November 2012 to April 2013 the parents were seen by therapist Erin Christy of the Bowen Center. She provided assistance with regard to coping skills, life skills, and therapy.… She determined that the parents understood the skills she taught but did not know how to implement [them] in their daily functioning.… [Mother's] therapeutic services were discontinued by the Bowen Center's liaison to [DCS].

19. Beginning in May, 2013 the Mother and Father were seen by therapist Andrew [Liechty] of the Bowen Center. From his testimony the Court finds that the Mother reported she had no mental health condition. However, the Bowen Center's psychiatric report with regard to the

5

Mother reflected a diagnosis of mood disorder and delusional thinking (indicative of bi-polar disorder). The Mother did not want to take her prescribed medications. The therapist observed the Mother to have paranoid thoughts and incoherent speech.

20. Dr. Hani Ahmad, clinical director and child psychologist for the Bowen Center saw the Mother twice in 2013. After his first meeting he concluded that the Mother suffered from paranoia and disorganized thinking. He accepted the Mother's refusal to take medications pending further review of her condition. By his last meeting with her he concluded that she needed to be prescribed Geodon. Without medication he opined that a psychotic break could result. The Mother, he testified, has no insight into her mental health and could harm herself or others, including a child.

21. On or about May 10, 2013 the Mother admitted herself into the Women's Shelter. By her testimony she stated that she went there to understand whether she was abused or if she had been abused. On May 12, 2013 the police were called to the facility. From the testimony of Kenneth Johnson of the Fort Wayne Police Department, the Court finds that the Mother had locked herself in a small room. She would not respond to the staff. When the officer made entry she advised that she felt threatened by the other [residents] and the staff. She was expelled from the property and the officer transported [her] to a home that she advised was the residence of her relatives. Later that day the husband appeared at the police station. He advised Officer Johnson that he was looking for his wife. He stated that she was a paranoid schizophrenic and was not on her medications. He also noted that the Mother was demonstrating erratic behaviors and had left. The Officer assured him that his wife was safe and advised him to seek the assistance [of DCS] or the Mental Health Association.

….

23. Officer Johnson saw the Mother again on June 17, 2013 when she came into his office to report a problem at the library. After a discussion the Mother had to be escorted [from] the station.

24. Throughout the pendency of the underlying CHINS case, the Mother's visits with her child have been supervised. The Father was offered unsupervised visits. However, beginning in the winter months he expressed concern that his exercise of unsupervised visitation would

6

increase the amount of time the child would be in a car during hazardous weather conditions. He therefore opted to continue his supervised visits with the Mother under the supervision of SCAN, a local agency contracted for that purpose.

25. From the testimony of Amanda Nichols, SCAN therapeutic visitation supervisor, the Court finds that the Mother and Father requested therapeutic visitation because regular visits were not going well. She testified and the Court finds that the Mother will become upset if the Father permitted the child to determine an activity outside the prearranged plan. The Mother gets upset "out of the blue["] and her angst increases if she is redirected.

….

27. On one occasion the child was brought to the visitation with a coat that had been provided by the foster mother. The mother took the coat and would not return it until another coat, the one left at the foster home, was returned. The episode upset the child. On another occasion when the child leaned up against her, the Mother told her to get out of her personal space. [In] yet another incident the Mother observed what she believed to be serious injuries to the child. She called the police and an ambulance and directed that the child be taken to the hospital. The injuries were superficial and had been sustained while the child was at a doctor's appointment. Similar conflicts with the Mother were reported by SCAN visitation supervisor Angel Ness.

28. On December 31, 2013, SCAN supervisor Robin James monitored the interaction of the parents with the child … during a scheduled visit. The Father and child played on the floor. The Mother ordered the Father to sit with her and to pick a more appropriate toy for the child. The Mother reminded the child that she had told her before not to invade her personal space. She then drew an imaginary line around herself and announced that was her personal space. When addressed by the Father, the Mother became angry. She hit him and clenched her fists. The child reacted emotionally from the episode and the visits were concluded. The Mother's visitations were then suspended.

….

30. The Father has advised service providers and has testified that he is not willing to separate from the Mother and care independently for the child.

31. Should parental rights be terminated [DCS] has an appropriate plan, that being adoption.

32. The child's Guardian ad Litem/CASA has also concluded that the child's best interests are served by the termination of parental rights. In support of her conclusion she cites the Mother's significant mental health issues and the historic cycle of her inability to manage her illness. In addition the Guardian ad Litem notes that the Father comforts and protects the Mother over the needs of the child. The Father has not shown an ability to benefit from services and cannot physically protect the child when with the mother. She, too, has concluded that the recommended adoption by the foster parent is in the child's best interests.

**BASED ON THE ABOVE FINDINGS OF FACT THE COURT APPLIES THE RELEVANT STATUTORY LAW AND CONCLUDES THAT:**

1. …. In the present case the child has been placed outside the care of Respondent Parents under a Dispositional Decree for more than six (6) months prior to the filing of the petition to terminate parental rights.

2. … By the clear and convincing evidence the court determines that there is [a] reasonable probability that [the] reasons that brought about the child's placement outside the home will not be remedied. In this case the Court finds and concludes by the clear and convincing evidence that the Mother poses a risk to the safety and well-being of the child when in her care. She insists on maintaining a personal space that cannot be entered by the child. The safe care of a toddler does not lend itself to such an on-going restriction. Unpredictably the Mother can become agitated and take irrational action…. Her husband goes to great lengths to interpret what therapists have described as disjointed and delusional thinking. She has demonstrated a history through which the use of medications can assist her in maintaining her sanity and to provide for a child. However, she and the Father have little recognition if any of her mental illness. Both are not supportive of the medicinal regimen she requires to maintain her health and, in turn, safely provide for a small child. The Father has been afforded the option of separately providing for the child. However, he has chosen, instead, to remain

8

with his wife. He does not have the support or ability to provide the level of supervision required to ensure the child's safety when in the company of her mother. He is unwilling and incapable of ensuring that the Mother has no unsupervised contact with the child while she refrains from following her required mental health care. The circumstances today are the same as that which existed at the time of the Preliminary Inquiry and CHINS adjudication.

3. …. In this case the Guardian ad Litem has concluded that termination of parental rights is in the child's best interests. The child needs a safe stable and nurturing home environment. The child has suffered emotional turmoil during visitations with her parents. The child has not been able to be safely placed back into the care of either parent and their supervised visits continue. The child needs a safe, sustainable nurturing environment that the parents are unable to provide. By termination of parental rights the child can be freed for adoption. The same serves her best interests.

4. The Department of Child Services has thus proven by clear and convincing evidence that the allegations of the petition are true and that the parent-child relationships should be terminated.

Appellant's App. at 10-17 (citation omitted). Father now appeals.

## Discussion and Decision

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "However, the trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination of the parent-child relationship." *In re J.S.*, 906 N.E.2d 226, 231 (Ind. Ct. App. 2009). "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet

their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted).

Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege

   (A) that one (1) of the following is true:

   (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

   (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

   (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

   (B) that one (1) of the following is true:

   (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

   (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

   (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

   (C) that termination is in the best interests of the child; and

   (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We will neither reweigh evidence nor judge witness credibility. *Id.* "Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* We apply a two-tiered standard of review: we first determine whether the evidence supports the trial court's findings and then determine whether the findings support the judgment. *Id.* "In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous." *Id.* "A judgment is clearly erroneous when the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re A.S.*, 905 N.E.2d 47, 49 (Ind. Ct. App. 2009).

Father first challenges conclusion 2, which states that there is a reasonable probability that the conditions that resulted in V.A.'s removal will not be remedied. When determining if there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied, "a trial court must judge the parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013).

11

"The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child." *Id*. "The trial court may also consider the services offered to the parent and the parent's response to those services as evidence of whether conditions will be remedied." *Id*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied* (2000), *cert. denied* (2002).

Specifically, Father contends that "there has been no showing that mother's odd behavior poses any kind of physical threat to the child." Appellant's Br. at 11. The trial court's uncontested findings establish that Mother has exhibited symptoms of mental illness far more serious than "odd behavior," and both Nurse Lothamer and Dr. Ahmad opined that Mother's refusal to manage her illness with medication could put a child in her care at risk. Father also contends that the trial court's conclusion that he "is not supportive of the medicinal regimen mother requires is not supported by the evidence. In fact, [he] recognized the need for his wife to maintain her medication regimen and tried to persuade her to follow[] it." *Id*. The evidence most favorable to the trial court's judgment, however, indicates that Father has limited insight into Mother's mental illness and, in Dr. Ahmad's words, has "let

12

[Mother] decide what she wants" when it comes to managing her illness with medication. Tr. at 383. In sum, Father has failed to show that conclusion 2 is clearly erroneous.[1]

Father also challenges conclusion 3, which essentially states that termination of parental rights is in V.A.'s best interests and that adoption is a satisfactory plan. We have recognized that "the best interests of the child are paramount in termination proceedings and that children should not be compelled to suffer emotional injury, psychological adjustments, and instability to preserve parental rights." *L.S.*, 717 N.E.2d at 210.

> In termination cases, we have held that the trial court is required to look to the totality of the evidence to determine the best interests of a child. Relevant factors include, among others, a parent's historical and current inability to provide a suitable environment for the child; the recommendations of the child's case worker or guardian ad litem; and the child's need for permanence and stability.

*In re Adoption of M.S.*, 10 N.E.3d 1272, 1282 (Ind. Ct. App. 2014) (citations omitted).

Father concedes that the guardian ad litem opined that termination is in V.A.'s best interests but claims that he "has gone to great lengths in his attempt to be reunified with his daughter. He completed and benefitted from services. He has done everything asked of him,

---

[1] Father also "challenges any finding or inference made by the trial court which determined that there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well being of V.A." Appellant's Br. at 10. Because the trial court made no such finding, we do not address this argument. And finally, Father says,

> If those in the system, including the trial court, believed that mother should be removed from the family's dynamic, then it could have made this choice by terminating the mother's parental rights and leav[ing] the father's parental rights intact. A better choice would have been to provide home-based services to assess mother's parenting abilities (or dangers) when [Father] was off at work.

*Id*. at 12. Father disregards Mother's erratic and disturbing behavior during her supervised visits with V.A. and his own refusal to separate from Mother.

but (1) convince his wife to take her medicine or (2) separate from or divorce her." Appellant's Br. at 14. Father did complete court-ordered services, but the evidence most favorable to the trial court's judgment indicates that his insight into Mother's mental illness remains limited and that he has been either unwilling or unable to persuade Mother to manage her illness with medication. When Mother's visits with V.A. were cut short because of inappropriate behavior, Father chose to leave with Mother instead of staying to comfort the traumatized V.A.

We are sympathetic to Father's desire to remain with Mother and be reunified with V.A., but the unfortunate reality is that the evidence clearly and convincingly demonstrates that he would be unable to ensure V.A.'s physical safety and emotional well-being as long as Mother refuses to take medication and remains in his household. And it is well settled that "[t]he trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development are permanently impaired before terminating the parent-child relationship." *In re M.S.*, 898 N.E.2d 307, 311 (Ind. Ct. App. 2008). Father's arguments regarding V.A.'s best interests are essentially invitations to reweigh evidence and judge witness credibility in his favor, which we may not do. The same may be said for his arguments regarding adoption as a satisfactory plan for V.A.'s care and treatment. Father has failed to show that conclusion 3 is clearly erroneous, and therefore we affirm the trial court's termination order.

Affirmed.

FRIEDLANDER, J., and KIRSCH, J., concur.

14